Ardell Johnson. State Bar No. 95340
KORDA, JOHNSON & WALL, LLP
66 E. Santa Clara Street. Suite 250
San Jose, CA 95113
Tel:  (408) 494-0700
Fax:  (408) 494-0707
e-mail: arjoh@pacbell.net

Attorneys for Plaintiff.
BigFix Asia, PTE. Ltd.

**E-FILING**

ADR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

BIGFIX ASIA PTE. LTD,

        Plaintiff,

  vs.

BIGFIX, INC.,

        Defendant.

Case No: C08 04023 HRL

COMPLAINT FOR VIOLATION OF
CALIFORNIA FRANCHISE INVESTMENT
LAW, FRAUD, BREACH OF CONTRACT,
INTERFERENCE WITH CONTRACT, AND
FOR QUANTUM MERUIT DAMAGES

AND DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1.      Plaintiff, BIGFIX ASIA Pte. Ltd. ("BFA") is a Singapore corporation with its principal place of business at 115 Eunos Avenue, 3 Singapore 409839.

2.      Defendant BigFix, Inc. ("BFI") is a Delaware corporation doing business in the State of California providing security software and services to clients worldwide.

3.      This court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332.

4.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(a).

## INTRADISTRICT ASSIGNMENT

5.    Pursuant to Civil L.R. 3.2(c) the action arises in Alameda County, California.

## FIRST CLAIM FOR RELIEF
### (Violation of California Franchise Investment Law)

6.    On or about August 24, 2004 BFA and BFI entered into the written contract attached to this complaint as Exhibit A (hereafter referred to as "the Agreement"), pursuant to which BFI sold to BFA the exclusive right to engage in the business of offering, selling, or distributing BFI's products and services in a designated territory.  The products and services BFA acquired the exclusive right to sell included licenses for security software and services.

7.    The Agreement required BFA to use sales and marketing schemes and systems substantially controlled by BFI, and to associate itself with BFI's trademark, service mark, trade name, logotype, and advertising.

8.    BFA paid the sum of $500,000.00 for the exclusive right to sell BFI's products and services.  Thereafter, BFA was required to obtain BFI's approval for all sales transactions and to pay 40% of its sales revenue from those transactions to BFI.

9.    The transaction between BFI and BFA constituted the sale of a franchise for which BFI was required, but failed to comply with the California Franchise Investment Law by either registering the franchise offering or obtaining an exemption from the registration requirement for same.

10.    BFI did not provide an offering circular to BFA.

11.    BFA did not know until April 2008 that BFI failed to register the franchise offering or obtain an exemption from the registration requirement under the Franchise Investment Law.

12.    BFI's failure to comply with the registration requirement was willful.

13.    As a result of BFI's willful failure to comply with the Franchise Investment Law BFA is entitled to rescind the transaction and recover its financial losses incurred as a result of its

1   franchise investment which include, but are not limited to the loss of its initial $500,000.00

2   investment and in excess of $2 million it invested in the franchised business.

3        Wherefore plaintiff seeks judgment against defendant, BFI, as set forth below.

### SECOND CLAIM FOR RELIEF
(Fraud)

6        14.    Plaintiff incorporates by reference and realleges in this cause of action paragraphs 1

7   through 5 of this complaint.

8        15.    On August 23, 2004 BFI, made written promises to BFA.  The written promises

9   are contained in the document entitled "Master BigFix Enterprise Suite (BES) Distributor

10  Agreement ("Agreement"), a copy of which is attached to this complaint as Exhibit A.  George

11  Billman, who signed the document on August 23, 2004 as BFI's executive vice-president, made

12  the written promises, including, but not limited to, a promise that BFA would have the exclusive

13  right to sell BFI's products and related services in a territory consisting of four regions comprising

14  (i) Greater China, including the People's Republic of China, Hong Kong, Macau and Taiwan; (ii)

15  South East Asia including Singapore, Malaysia, Indonesia, Philippines, Myanmar, Thailand,

16  Vietnam, Brunei, Laos, and Cambodia; (iii) Australia and New Zealand; and (iv) South Asia,

17  including India, Nepal, Pakistan, and Sri Lanka; a promise that BFA would be an independent

18  company; a promise that BFA would have the right to issue licenses and to make and distribute

19  unmodified copies of the product components;  a promise that BFI would participate at its own

20  expense in the development of business in BFA's territory a promise that BFA's royalty fee would

21  be forty percent (40%) of BFA's gross revenues from the sale of BFI's products and fifteen

22  percent (15%) from the sale of BFI's services; a promise that BFI would negotiate in good faith to

23  adjust the discount allowed to BFA as required by market conditions; a promise that BFI's

24  payments would be due within 90 days following delivery of the products or services to the

25

26

Licensee; a promise that BFI would pay all taxes based on its income from BFA; and, a promise that BFI would negotiate terms for acquiring BFA before the Agreement expired.

16.    In the summer of 2004 after Chaw met with Billman in Emeryville, CA and before the Agreement was signed on August 24, 2004, Billman met with Chaw in Singapore at Chaw's office located at 72 Anson Road. At that meeting Billman represented he was a key executive in BFI authorized to speak for the company and its CEO, David Robbins whom he described as his "partner," would approve what Billman approved. Billman represented (i) BFI would assist BFA in building a business in Asia to market and sell BFI's product and services; (ii) BFA should not worry about the Singapore withholding tax because BFI would "cover it"; and, (iii) that even though BFI could not make a written commitment, BFI would purchase BFA's business.

17.    When Billman and BFI made the foregoing representations and the written promises Billman knew that BFI had no intention of keeping the foregoing promises or performing the Agreement. The true facts were that Billman and BFI made the promises, and entered into the Agreement to induce BFA to pay the sum of five hundred thousand dollars ($500,000.00) to BFI and to induce BFA to spend its own money to develop market demand and sales in Asia, because BFI wanted to expand its business at BFA's expense+.

18.    BFA was ignorant of defendant's intention not to perform and relied on defendant's promises by paying $500,000.00 to BFI and by spending substantial sums of money hiring employees and building an organization to develop market demand and sales of BFI's product and services. BFA could not reasonably have discovered defendant's secret intention and if BFA had known defendant's true intention, it would not have entered into the Agreement, or paid $500,000.00 to BFI or spent any money developing a business to sell BFI's product.

19.    As a result of the defendant's fraudulent conduct, BFI sustained a monetary loss, the amount of which is not presently known, but which exceeds the amount required to establish

1    the diversity jurisdiction of this court, for which BFA seeks compensatory damages according to

2    the proof thereof at trial.

3         20.    In doing the things herein alleged, defendant acted with fraud, malice or oppression

4    and with conscious disregard for plaintiff's rights and property by reason of which defendant

5    should be required to pay punitive damages according to the proof thereof at trial.

6        Wherefore plaintiff seeks judgment against defendant as set forth below.

7

**THIRD CLAIM FOR RELIEF**
(Breach of Contract vs. BFI)

8

9         21.    Plaintiff incorporates by reference and realleges in this cause of action paragraphs 1

10    through 5 of this complaint.

11         22.    On or about August 24, 2004 BFA and BFI entered into a written contract

12    (hereafter referred to as "the Agreement"), a copy of which is attached to this complaint as Exhibit

13    A.

14         23.    BFA performed the terms and conditions of the contract except as BFI interfered

15    with or prevented BFA's performance.

16         24.    BFI breached the Agreement by, among other things, failing to perform the

17    payment terms of the Agreement and by using its control over BFA's sales and the issuance of

18    licenses to BFA's customers for BFI's own financial gain at BFA's expense.  BFI required BFA to

19    pay a greater percentage of revenue to BFI than required by the Agreement as a condition of

20    approving BFA's sales.  BFI required BFA to make payments before the payments were due under

21    the Agreement as a condition of approving BFA's sales.  After BFI approved BFA sales, BFI

22    withheld the licenses for BFA's customers as a means of forcing BFA to make payments before

23    they were due under the Agreement.  BFI breached the Agreement by restricting BFA's

24    operations by, among other things, requiring BFI's employees to deal directly with BFA's

25    prospective customers as a condition of approving BFA's sales, demanding that BFA agree

26

prospective transactions would be booked directly to BFI as a condition of approving the sale, demanding that BFA prematurely place order for sales to its customers to build up BFI's revenue numbers, refusing to honor agreed upon pricing terms to customers, issuing keys with shortened effective dates, and failing or refusing to deliver new licenses and to renew licenses to BFA's customers approved by BFI. BFI breached the Agreement by insisting that BFA agree to different terms more favorable to BFI than those in the existing Agreement and thereafter forcing BFA to accept the new terms by withholding licenses due to BFA's customers, refusing to approve BFA's transactions and conditioning BFI's performance on BFA's agreement to accelerate payments. BFI also breached the Agreement by refusing to accept responsibility for its own taxes imposed by Singapore law, by soliciting BFA's employees, and by terminating the Agreement pursuant to a demand for payment of overstated amounts that were not due pursuant to the payment terms of the Agreement.

25.    BFA has sustained damages resulting from BFI's breach of contract, which include, but are not limited to the loss of more than $2 million BFA incurred in performing the contract, the loss of renewable license revenue, the lost value of BFA's business, and the loss of revenue from existing customers who failed or refused to pay BFA for product purchased from BFA, and the loss of revenue from customers who would have purchased product from BFA but did not do so due to BFI's breach of the contract. BFA does not know the total amount of its damages at this time and claims damages according to the proof thereof at trial.

Wherefore plaintiff seeks judgment against defendant, BFI, as set forth below.

### FOURTH CLAIM FOR RELIEF
(Interference with Contracts vs. BFI)

26.    Plaintiff incorporates by reference and realleges in this cause of action paragraphs 1 through 5, of this complaint.

27.     After BFA established its relationship with BFI in August 2004, BFA expended its own funds to develop a business entirely devoted to the marketing and sale of BFI's product and services in Asia. In so doing BFA entered into contractual relationships. including but not limited to contracts with employees and contracts to provide products and services to customers.

28.     BFA entered into employee contracts with Francis Ong. Dominic Cheah, Jia Xin Liu, and Reema Shah and others, and entrusted these employees with confidential and proprietary information regarding BFA's sales strategies, existing and potential customers. Said employees were required as a condition of their employment to maintain the confidentiality of said information and to use it only for BFA's benefit. BFA derived economic benefit from its contractual relationships with these employees. Defendant had knowledge of these contracts.

29.     BFA entered into contracts with customers for the sale of BFI's product and services. These customers included Taarak India, Ltd., Select Technologies, Ltd., and others. BFA derived economic benefit from its contractual relationships with these customers. BFI had knowledge of these contracts because BFI approved the terms of sale and issued the licenses to BFA's customers.

30.     Before terminating the Agreement, BFI interfered with BFA's employee contracts by, among other things, soliciting BFA's employees and encouraging said employees to breach their respective employment contracts with BFA by contacting BFA's customers and inducing BFA's customers to postpone transactions with BFA until BFI terminated the Agreement, or to do business directly with BFI instead of BFA. After BFI terminated the Agreement with BFA, BFI interfered with BFA's employment contracts by inducing BFA's employees to violate their contracts by using BFA's confidential information to solicit business for, and otherwise benefit, BFI.

31.     Before BFI terminated the Agreement, BFA made sales to customers that had been approved by BFI and for which BFI issued licenses to these customers as a result of which BFA

was entitled to payment from these customers. After BFI terminated the Agreement, BFI contacted BFA's customers and induced them not to pay BFA. In so doing, BFI misrepresented that it had acquired BFA and was entitled to receive the payment owed to BFA. BFI misrepresented that BFA had obtained licenses from BFI through criminal fraud. Even though BFA's customer held a valid license issued directly to the customer by BFI, BFI represented it would not support licenses held by BFA's customers.

32.    BFI'S interference with BFA's contracts, herein alleged, caused BFA to sustain damages because its customers refused to pay money they owed to BFA for the product, the amount of which is not yet known, but for which BFA claims damages according to the proof thereof at trial.

33.    In doing the things herein alleged, BFI acted with fraud, malice or oppression and with conscious disregard for BFA's rights and property by reason of which BFI should be required to pay punitive damages according to the proof thereof at trial.

Wherefore plaintiff seeks judgment against BFI as set forth below.

## FIFTH CAUSE OF ACTION
(Quantum Meruit)

34.    Plaintiff incorporates by reference and realleges in this cause of action paragraphs 1 through 5 of this complaint.

35.    Within the last four years at BFI's special request BFA paid BFI the sum of $500,000.00 and invested BFA's own funds for the purpose of developing market demand, sales and a customer base for BFI's products in Asia. In so doing, BFA established a business exclusively devoted to marketing and selling BFI's product and services in the territory described in this complaint pursuant to BFI's agreement and representations that BFA would be compensated with profits earned from the sale of BFI's product and services and BFI's purchase of the business at a future date.

36.    As alleged in this complaint BFI appropriated all of the benefit of the business developed by BFA including, but not limited to, BFA's employees, revenue from BFA's customers, sales to end users of BFI's products and services developed by BFA and the sales network BFA built, and name recognition and a market demand for BFI's product and services in BFA's territory where none existed until it was developed by BFA.

37.    As a result of BFI's conduct alleged in this complaint, BFI has been unjustly enriched at BFA's expense for which BFA seeks a quantum meruit recovery.

Wherefore BFA seeks judgment as set forth below.

BFA prays for judgment as follows:

1.    For compensatory damages according to the proof thereof at trial;

2.    For rescission and restitution according to the proof thereof at trial;

3.    For exemplary damages according to the proof thereof at trial;

4.    For costs of suit, including attorney's fees pursuant to Civil Code section 1717;

5.    For such other further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, BigFix Asia, Pte. Ltd. hereby demands a trial by jury.

Dated: August 22, 2008

KORDA, JOHNSON & WALL, LLP

ARDELL JOHNSON, Attorneys for
Plaintiff, BigFix Asia Pte., Ltd.



## MASTER BIGFIX ENTERPRISE SUITE (BES) DISTRIBUTOR AGREEMENT ("AGREEMENT")

Cover Sheet

This Agreement is made as of 24 August, 2004 ("Effective Date"), Singapore time, between BigFix, Inc., ("Company"), a Delaware corporation with an office at 6121 Hollis Street Emeryville, CA 94608 (Phone: (510) 652-6700; Fax (510) 652-6742; E-mail: legal@bigfix.com), and the channel partner "PARTNER" listed below.

| | |
|---|---|
| PARTNER: BIGFIX ASIA PTE. LTD., a Singapore Corporation with Company No.: 200410679E. | Contact: Chaw Chong Foo |
| Address: 20 Peck Seah Street, #05-00, Singapore 079312. | Phone: 65-6438-7182; Cell: 65-9118-8226 |
| E-mail: cf_chaw@yahoo.com.sg | Fax: 65-6438-7892  65-6481-7892 ~~cf~~ |

Term: From August 24, 2004 until December 31, 2008

Company Products: The BigFix Enterprise Suite, which shall include the following:

Product Components: defined as the BES Server, the BES Relay Server, the BES Console and any related proprietary software or materials provided by Company in connection with a BigFix Solution (collectively, the "BigFix Platform") and the BES Client ("BigFix Agent"). The BigFix Agent shall be available for the following operating systems: Windows; Linux; Solaris; HP-UX; AIX ; Mac OSX (when made generally available by Company); and BigFix Development Environment ("BDE.").

BigFix Solutions: defined as a subscription to a "Content Site" (defined as any site maintained by the Company or an authorized third party that provides Fixlet Messages (defined below) for use in connection with the Product Components. The following BigFix Solutions shall be available hereunder:

- Patch Manager (versions for English, Korean, Simplified Chinese, Thai and any other languages, when made generally available by Company);
- Client Manager for Anti-Virus;
- Vulnerability Identification & Remediation;
- Configuration Manager;
- Mobile Security Manager (when made generally available by Company);
- Any other BigFix Solutions that Company makes generally available in connection with the Product Components during Term of this Agreement; and
- Custom Solutions, where each Custom Solution is defined as a site created and hosted by PARTNER (or an authorized reseller, distributor of Partner or a Licensee) (as defined below) in accordance with the terms of this Agreement that contains Fixlet Message content specifically tailored to address the key issues important to such party's customer base and that is accessible only by Licensed Machines (as defined below) for which Company has been paid a BDE run-time enablement fee in accordance with Exhibit A (each a "BDE-Enabled Machine").

Updates and New Products: In addition to the updates to which Partner is entitled as part of Support and Maintenance Services, the parties agree that each of the following shall be made available to Partner hereunder (when made generally available by Company during the Term of the Agreement): (i) the next major release (version 5.0) of the Product Components listed above and subsequent major releases (e.g. 6.0, 7.0, etc.); (ii) any separately licensable products made generally available by Company in connection with any major release of the Product Components (e.g. version 5.0, 6.0, or 7.0, etc.). Items described in subsection (ii) above shall be collectively referred to as "New Products." Each New Product will include any new releases or updates thereto that Company makes generally available during the Term of this Agreement. Notwithstanding anything else, Partner is not granted any rights under this Agreement with respect to any product or service (a) of an acquirer of or successor to Company or Company's stock, business or assets (whether by merger, sale or otherwise: an "Acquisition"), whether developed or introduced before or after such Acquisition or (b) introduced or developed by Company after such Acquisition. All Betas or early releases should also be promptly made available to the Partner.

GDSVF&H\552259.1

Plaintiff's Complaint, Exhibit A

Received Fax         Aug 23 2004 7:14PM     Fax Station:  JUNGLE DIGITAL            p 2

BigFix Channel Agreement Number: _____

API Availability: Company's Platform API and Client Compliance API shall be made available (when Company makes each generally available) for licensing by Partner to its OEM partners for distribution to Licensees in accordance with the license granted in Sections 2(a) (i)-(iii) and the other terms of this Agreement as part of a Bundled Product (to be defined on a case-by-case basis): provided that the availability of any API hereunder shall be subject to prior written authorization by Company, to be granted in Company's sole discretion based on factors including but not limited to: (i) agreement on a satisfactory definition of Bundled Product (Company may require, among other things, that a Bundled Product not contain the BES Console and that it be fully integrated or embedded and re-branded), (ii) substantial market differentiation from the market for Company Products; (iii) demonstrated ability to retain effective control of licensing, (iv) availability of adequate backline technical support, and (v) agreement as to price and any other applicable additional terms.

Discounted Prices and Fees: Shall be due and payable by PARTNER to Company in accordance with Exhibit A. PARTNER shall make a non-refundable pre-payment against which the fees due hereunder shall accrue. Such prepayment will be made in two installments: the first installment of $US200,000/- shall be paid no later than September 30, 2004, and the second installment of $500,000/- shall be paid no later than December 15, 2004. Once the prepayment amount has been exhausted, fees will be due and payable as set forth in Exhibit A.

Support: Subject to payment of applicable annual fees as set forth in Exhibit A. Support and Maintenance for the Company Products shall be provided in accordance with Section 5 of this Agreement and any other clauses within this Agreement that are related to Support and Maintenance.

Territory: The Territory shall consist of the four "Regions" listed below:

- Greater China, comprised of the Peoples Republic of China (inclusive of Hong Kong), Macau and Taiwan;
- Association of Southeast Asian Nations (ASEAN), comprised of Singapore, Malaysia, Indonesia, Philippines, Myanmar, Thailand, Vietnam, Brunei, Laos, and Cambodia ;
- Australasia, comprised of Australia and New Zealand; and
- South Asia, comprised of India, Nepal, Pakistan and Sri Lanka.

Partner acknowledges that it will serve this Territory with Company Products and Solutions "as is" (as of the Effective Date), and that any localization services shall be performed only at Company's discretion.

eceived Fax :        Apr 23 2004 7:14PM    Fax Station :    JUNGLE DIGITAL                    p. 3

BigFix Channel Agreement Number: _____

Exclusivity: Subject to the terms and conditions of this Agreement and compliance therewith, including without limitation the prepayment obligation set forth above, and compliance with the conditions set forth in each of Exhibit B (re: business targets and change of control/key employee retention) and Exhibit D (re: technical certifications), PARTNER shall have exclusive rights to act as a master distributor in the Territory with respect to the Company Products, BigFix Solutions and related services defined herein. Notwithstanding the foregoing, Company shall be free to operate within the Territory (a) pursuant to agreements (whether entered prior to or after the Effective Date) that encompass but are not limited to (or principally comprised of) the Territory or a portion thereof for the distribution of any of the following: (i) products or services that include integrated or embedded Company Products or BigFix Solutions (such as in an OEM or similar arrangement); (ii) Custom Solutions created and hosted by a party other than Company; or (iii) Company Products and/or BigFix Solutions delivered to end users as part of a managed service offering, and (c) pursuant to agreements between Company or its other partners and end users headquartered outside the Territory who may deploy or use the Company Products within the Territory, provided however that Company shall use commercially reasonable efforts to refer to Partner any requests by such end users for technical support, installation assistance or other services to be provided within the Territory in connection with the Company Products.

As a condition of the foregoing exclusivity, Partner agrees that (I) it will not (directly or indirectly) engage in any sales, marketing, licensing, distribution or other activities related to any products that compete with the Company products or any portion thereof, and (II) both Chaw Chong Foo and BIGFIX ASIA PTE. LTD. (the "Operating Entity") will use best efforts to market and distribute the Company Products in the Territory. Company shall identify to Partner the third party resellers to whom Company has contractual obligations in the Territory existing as of the Effective Date ("Existing Resellers") and shall use commercially reasonable efforts to refer such Existing Resellers to Partner for fulfillment of orders in the Territory. In addition, Company shall refer to Partner all inquiries received by Company from any end users or prospective new resellers within Territory. Notwithstanding the foregoing, nothing in this Agreement shall prevent Company from complying with any contractual obligation of Company existing as of the Effective Date.

GDSVF&H\552259.1

3

eceived Fax :        Aug 23 2004 7:14PM    Fax Station :      JUNGLE DIGITAL                    P    4

BigFix Channel Agreement Number: _____

Additional Terms and mutually executed addenda specified here control over expressly contrary terms of the terms and conditions:

The parties agree that the Technical Certification Services, Requirements and Authorizations will apply as set forth in Exhibit D. Partner is expected to attain required certification or authorization within three (3) months after Company (in its discretion) makes the required materials for knowledge transfer, hands-on exercises, or certification tests available (the "Availability Date"). Company will notify Partner in writing about such availability on a timely basis. With respect to any requirement that Partner maintain any certifications or authorizations in order for exclusivity to continue, if Partner has not attained the certifications or authorizations within three (3) months of Availability Date, then Company shall notify Partner of such failure and Partner shall have an additional forty five (45) days following delivery of such notice (a "Grace Period") in which to complete the required certifications or authorizations.  Only if Partner fails to complete the required certifications or authorizations by the end of the Grace Period will Partner relinquish exclusivity in the Territory. For avoidance of doubt, technical certifications for which the required materials are not yet made available by Company are not a binding condition for continuance of exclusivity. See Exhibit D, paragraph 1 regarding fulfillment of certifications or authorizations using telecommunications or correspondence.

In addition, Company will use commercially reasonable efforts to  provide visits to PARTNER's headquarters by appropriate Company representatives from both product management and business development functions for support of initial pre-sales presentations, certification exercises, market launch activities and initial reference customer selling, to be scheduled at the mutual convenience of the parties. At least one such visit will be made from product management and business development areas within ninety (90) days of the Effective Date at Company's expense.  Over the Term of the Agreement, Company shall use commercially reasonable efforts to make periodic visits to, and participate in the development of business in, the Territory at the Company's expense. The Company agrees to provide all necessary and applicable sales, marketing and technical materials to the Partner.  In addition, Company agrees to identify and include a reference to Partner on Company's website, and provide a link to the Partner's website.

If Partner demonstrates to Company's satisfaction that perpetual licensing is required by a potential Licensee of Partner, then, with Company's prior written authorization only, Partner may license the Product Components directly to such Licensee on a perpetual basis, provided that any such perpetual license term ("Perpetual License") shall be subject to the termination provisions of the applicable end user license agreement, and provided further that Partner acknowledges and agrees (and will require each Licensee to acknowledge and agree in writing, for Company's benefit) that Company's obligation to provide access to any Content Sites, Fixlet Messages, or Support and Maintenance Services shall be limited to the subscription or maintenance period for which Company has received full payment and that neither Partner nor any Licensee shall be entitled to any of the foregoing as part of a Perpetual License.

With respect to any Regions in which Partner has maintained its exclusivity, the parties will have a discussion, during the one hundred eighty (180) days prior to the end of the Term of this Agreement, to review Partner's performance and to discuss terms for the possible renewal of this Agreement or a possible acquisition of the Partner, subject to mutual written agreement as to reasonable Minimum Targets for a two (2) year renewal period (in the case of renewal); provided, however, that if the parties fail to execute a written mutually acceptable renewal agreement or purchase agreement for any reason (at either party's sole discretion) by December 31, 2008, then this Agreement shall terminate as of such date in accordance with its terms.

Received Fax :   Aug 23 2004 7:14PM   Fax Station :   JUNGLE DIGITAL   P. 5

BigFix Channel Agreement Number: _____

This Agreement includes the attached Terms and Conditions, all exhibits referenced herein, and all mutually executed addenda that reference this Agreement, and contains, among other things, warranty disclaimers, liability limitations and use limitations. Capitalized terms used in any portion of this Agreement that are not otherwise defined in this Agreement will have the meanings specified in this Cover Sheet. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

PARTNER:

By: _____

Name: __CHAW, CHONG FOO__

Passport No.: __S1611 6057 D__

Title: __President__

Date: __24 Aug 2004__

Company:

By: _____

Name: __GEORGE BILLMAN__

Passport No.: __700893846__

Title: __VP, Business Development__

Date: __24 Aug 2004__

Signed by PARTNER _____

In the presence of: _____

Name: __CHEAH YAK SEN, DOMINIC__

Passport No.: __S7439269 E__

Date: __24 AUG 2004__

Signed by Company _____

In the presence of: _____

Name: __MARIO POMPILI__

Passport No.: _____

Date: __8.23.04__

GDSVF&H:552259.1

5

Received Fax :    Aug 23 2004 7:14PM    Fax Station :    JUNGLE DIGITAL    p. 6

BigFix Channel Agreement Number: _____

## PARTNER'S TERMS AND CONDITIONS

1.    **Certain Definitions.** Capitalized terms will have the meaning indicated above unless more specifically defined herein. "Fixlet Messages" shall mean digital files (developed by a Licensee under an appropriate license agreement authorized hereunder or properly obtained from Company or a third party authorized by Company to so provide such files) containing some or all of the following elements: (A) a relevance clause written in the Company's proprietary relevance language which describes attributes of a computer system, its content or environment, or such other factors as may be supported by the Company from time to time; (B) text that is displayed to the BES Console operator which describes a particular condition or failure; and (C) computer system intelligible components which contain some form of action to remediate the discovered issue, all of which shall be in a format consistent with the standards set from time to time by the Company. "Licensee" shall mean a customer of PARTNER (or of an authorized distributor or reseller of PARTNER) located and taking delivery in the Territory (a) that is subject, for the Company's benefit, to an end user license agreement at least as protective of Company and its intellectual property as the Company's standard applicable end user agreement (the current form of which is attached and includes, among other things, limitations, restrictions, warranty disclaimers and liability limitations), and (b) for whom all licenses and subscriptions granted pursuant hereto continue only for so long as Company receives from PARTNER all fees associated with licenses and subscriptions granted to such Licensee. Each Product Component will include any new releases or updates thereto that Company makes available to PARTNER under this Agreement.

2.    **Grant of Limited License.**

(a) Subject to all the terms of this Agreement and compliance therewith, Company grants PARTNER a non-sublicensable (except as set forth in subsection 2(b) below), non-transferable, non-exclusive (except as set forth on the Cover Sheet), right to: (i) make and distribute unmodified object code copies of the Product Components and BDE to Licensees, provided that Licensees have only the right to:

(A) Act as an end user (and not a managed service provider) by: (1) allowing Licensee employees and contractors to use the Company Products designated on the applicable Licensee Term Sheet (defined below) in object code form only and only on the numbers of machines licensed from PARTNER (or PARTNER'S authorized distributor or reseller) for each applicable Company Product ("Licensed Machines") and, in the case of BDE, this includes the right to develop Fixlet Messages for internal use on BDE-Enabled Machines only (whether new or derivatives of existing Fixlet Messages), (2) distributing copies of the Product Components and Fixlet Messages only to, and only for internal use on, Licensed Machines (in the case of Fixlet Messages authored by Licensee or obtained from an authorized

third party, this distribution right is limited to BDE-Enabled Machines), and (3) accessing and downloading Fixlet Messages (using licensed Product Components in accordance with Company's then current access procedures) from any Content Site designated above and on the applicable Licensee Term Sheet for which Licensee has a then effective subscription for which Company has been paid the applicable subscription fees and any applicable BDE runtime enablement fees; OR

(B) Act as a managed service provider by: (1) allowing Licensee employees and contractors to use the Company Products designated on the applicable Licensee Term Sheet (defined below) in object code form only and only internally on properly Licensed Machines and, in the case of BDE, this includes the right to develop Fixlet Messages for use on BDE-Enabled Machines only (whether new or derivatives of existing Fixlet Messages), (2) distributing copies of the BigFix Agent, BES Relay Server and Fixlet Messages to MSP Customers (defined as managed service customers of Licensee who are bound, for the Company's benefit, by an end user license agreement at least as protective of Company and its intellectual property as the Company's standard applicable end user agreement) for use on such MSP Customers' Licensed Machines (in the case of Fixlet Messages authored by Licensee or obtained from an authorized third party, this distribution right is limited to BDE-Enabled Machines), and (3) accessing and downloading Fixlet Messages (using licensed Product Components in accordance with Company's then current access procedures) from any Content Site designated above and on the applicable Licensee Term Sheet for which Licensee has a then effective subscription for which Company has been paid the applicable subscription fees and any applicable BDE runtime enablement fees;

(ii). install, execute and use, in object code form only, the Company Products and access, download and distribute Fixlet Messages from Content Sites associated with the BigFix Solutions indicated on the Cover Sheet; provided that in the case of BDE this includes the right to develop Fixlet Messages (whether new or derivatives of existing Fixlet Messages), for the purposes of:

(A) Creating a Custom Site to distribute such Fixlet Messages to Licensees' BDE-Enabled Machines;

(B) Demonstrating the Product Components and BigFix Solutions to potential Licensees; and

(C) providing support and maintenance services to Licensees;

(iii) use, reproduces, copy and distribute documentation for the Company Products to Licensees in connection with the

Received Fax :    Aug 23 2004 7:14PM    Fax Station :    JUNGLE DIGITAL                                    P. 7

exercise of PARTNER's rights pursuant to this Section 2.

(b) PARTNER may exercise the rights granted in subsections 2(a)(i)-(iii) through its authorized distributors or resellers (including sub-distributors) who are bound in writing for the Company's benefit by terms as least as protective of the Company and its intellectual property as those of this Agreement, provided that PARTNER shall remain fully responsible for compliance by such distributors and resellers with the terms of this Agreement and that, if requested by Company, Partner shall provide Company with a copy of any such agreement.

(c) Any activity contemplated by this license grant shall be strictly in accordance with and subject to Company's applicable user documentation and, in the case of Fixlet Messages obtained from Company or third parties (or derivatives thereof), any limitations and conditions under which those Fixlet Messages were obtained, as well as any applicable third party rights. The term of the license or subscription with respect to any Company Product, Fixlet Message, BigFix Solution or Content Site shall be limited to the period specified above or on the applicable Licensee Term Sheet for which Company has received full payment.

3.    Additional Services. Company will use reasonable efforts to provide, and PARTNER will pay for, any Additional Services specified on the Cover Sheet or otherwise agreed upon by the parties.

4.    Restrictions; Proprietary Rights; Confidential Information.

(a)    PARTNER will not (and will not allow any Licensee or any other third party to): (i) reverse engineer or otherwise attempt to discover any source code or underlying ideas or algorithms of any Product Component or Fixlet Message (except to the extent that applicable law prohibits reverse engineering restrictions), (ii) modify, translate, or otherwise create derivative works of Company Products; (iii) distribute the Company Products or Fixlet Messages, except as expressly permitted herein; or (iv) allow the removal, alteration, covering or obscuring of any notice or mark that appears on the Company Products or Fixlet Messages, on any copies or media. All the limitations and restrictions on product Components or Fixlet Messages in this Agreement also apply to documentation.

(b)    As between the parties, Company and/or its suppliers have all right, title and interest in and to the Company Products, Fixlet Messages, and all copies and derivative works thereof except that, notwithstanding the foregoing, PARTNER (or a Licensee) may own only that portion of any Fixlet Message content that is created entirely by such party in accordance with a valid license to BDE, provided that neither PARTNER (nor any Licensee) may challenge the right of the Company or the right of any of Company's resellers, affiliates or customers to develop, use, or distribute any Fixlet Message content, notwithstanding any similarity to any Fixlet Message Content developed by PARTNER (or by a Licensee) hereunder.

(c) PARTNER will use then-current names, marks, logos, and other identifiers for the Company Products and

BigFix Solutions used by Company ("Trademarks") and Company designated intellectual property related notices on or in the packaging for the Company Products, and PARTNER's advertising and promotional material for such products, BigFix Solutions, and any services provided pursuant to this Agreement; provided that PARTNER will: (a) only use Trademarks in accordance with the Company's then current quality standards and usage guidelines; (b) at Company's request, submit samples of all packaging, advertising and promotional material to Company for approval; (c) allow the Company to monitor and approve the quality of PARTNER products and services;   and (d) upon termination of this Agreement for any reason, immediately cease all use of the Trademarks. For so long as exclusivity is maintained in a particular Region of the Territory, and for so long as the Operating Entity is not engaged in any other business activities, Partner will use the Trademark "BigFix" as part of the company name under which the Operating Entity does business that Region of the Territory, provided that all of the obligations and restrictions set forth in this Agreement that apply to Partner's use of Trademarks shall apply to Partner's use of any such company name and that, without limiting the generality of the foregoing, Partner must obtain Company's prior written approval of any such company name. At Company's request and expense, and subject to prior review and approval by Company, PARTNER will assist Company in making all applicable trademark filings and registrations to protect such Trademarks (including, without limitation, company names) in the Territory; all such filings and registrations and any use by PARTNER (and any related goodwill) shall be solely for the benefit of Company and shall name Company as the trademark owner. Upon expiration or termination of this Agreement (and upon Partner's loss of exclusivity in any part of the Territory), Partner agrees to transfer to Company (at Company's expense) any rights (including company name rights) that it may have acquired in connection with this Agreement. PARTNER will not otherwise use or register (or make any filing with respect to) any trademark, name or other designation relevant to the subject matter of this Agreement anywhere in the world. PARTNER will not contest anywhere in the world the use by or authorized by Company of any trademark, name or other designation or application or registration therefor, whether during or after the term of this Agreement.

(d) PARTNER agrees that all code, inventions, algorithms, know-how, ideas, and all business, technical and financial information it obtains from Company are the confidential property of Company and its suppliers ("Confidential Information").    Except as expressly and unambiguously allowed herein, PARTNER will hold in confidence and not use or disclose any Confidential Information. PARTNER's nondisclosure obligation will not apply to information it can document is generally available to the public (other than through breach of this Agreement). Because of the unique and proprietary nature of the Confidential Information, it is understood and agreed that Company's remedies at law for a breach by PARTNER of its obligations under this Section 4(d) will be inadequate and that Company will be entitled to equitable relief (including without limitation provisional and permanent injunctive relief and

specific performance) in addition to any other remedies.

5.      Support and Maintenance. While the license granted in Section 2 remains effective, as specified on the Cover Sheet and subject to the timely payment of all fees under this Agreement, Company will use reasonable commercial efforts to provide support and maintenance services solely to PARTNER for the Company Products as described in Company's then standard applicable channel support and maintenance terms and conditions ("Support and Maintenance Services"), the current version of which is attached. PARTNER will be solely responsible for and will provide all support to PARTNER's Licensees (either directly or through an authorized distributor or reseller). PARTNER will perform all related initial problem analysis, diagnosis, and replication of the problem at PARTNER location prior to contacting Company. All contact with Company relating to Support and Maintenance shall be through any qualified employees of PARTNER.

6.      Reporting; Other PARTNER Obligations. PARTNER represents, warrants and agrees that: (a) PARTNER will use its best efforts to market and distribute the Company Products and BigFix Solutions in the Territory in a manner consistent with good faith business practices; (b) PARTNER will within three (3) months of receipt of a new release of a Company Product implement the new release and will thereafter discontinue distribution of any prior release of that Company Product immediately; (c) PARTNER will keep accurate records and accounts in accordance with standard industry practices relating to the Company Products, Fixlet Messages, BigFix Solutions, Content Site subscriptions and PARTNER's activities in connection with this Agreement; (d) PARTNER will provide a completed Licensee Term Sheet in Company's then current form (the current form of which is attached) for each Licensee transaction (each a "Licensee Term Sheet") and other information relating to the Product Components, Fixlet Messages, BigFix Solutions, Content Site subscriptions or this Agreement that is reasonably requested from time to time by Company; (e) One month after the effective date and at the beginning month of each quarter, PARTNER will provide rolling forecasts for the next three months of prospective Licensee deals, including the status of particular deals and anticipated value and close dates, as well as other information relevant to PARTNER's anticipated sales of licenses or subscriptions to the Product Components, Fixlet Messages, BigFix Solutions and Content Site subscriptions; (f) neither this Agreement (nor any term hereof) nor the performance of or exercise of any rights under this Agreement, is restricted by, contrary to, in conflict with, ineffective under, requires registration or approval or tax withholding under, or affects Company's proprietary rights (or the duration thereof) under, or will require any termination payment or compulsory licensing under, any law or regulation of any organization, country, group of countries or political or governmental entity located within or including all or a portion of the Territory; and (g) PARTNER will cooperate and assist Company in bringing legal action against any Licensee or any other third party for unauthorized use, copying, or distribution of the Product Components or Fixlet Messages or breach of reseller, distribution, or end user license agreements or other violation

of Company's intellectual property rights anywhere in the Territory.

7.      Delivery. All Product Components shall be delivered in electronic format only and in accordance with Company's standard download procedures, unless otherwise agreed by the parties. Delivery with respect to a particular Licensee transaction will occur only following Company's receipt of a completed Licensee Term Sheet in Company's then current form for such transaction, which PARTNER shall promptly provide to Company by e-mail or at the Fax number listed on the Cover Sheet.

8.      Fees and Payment. PARTNER shall pay Company the prices and fees determined in accordance with the Cover Sheet to this Agreement and the Licensee Term Sheet for each Licensee transaction. Company reserves the right to change its minimum advertised prices on thirty (30) days notice to PARTNER in writing. When agreed as part of purchase orders to Company, PARTNER will pay all applicable travel-related expenses and shipping charges. All amounts payable by Partner to Company under this Agreement are non-refundable and non-cancelable. All payments will be exclusive of any federal, state, local or other government taxes, duties, excise, goods and services and value added taxes, but excluding any taxes or fees based on Company's net income. If a future tax is imposed that affects this Agreement, then the party who in the normal course of events would pay that tax shall be responsible for paying that tax. Only due to any suspected irregularities, Company or its agents may, with fifteen (15) business days notice, audit PARTNER's records and inspect PARTNER's facilities during normal office working hours to verify PARTNER's compliance with the provisions of this Agreement. However, such request by the Company shall not occur more than once in every six months. If an audit indicates an underpayment of five percent (5%) or more of any amounts due hereunder or other non-monetary noncompliance, PARTNER will promptly reimburse Company for the reasonable cost of the audit. Such rights will remain in effect through a period ending one year from the termination of this Agreement. All payments hereunder shall be made in U.S. dollars from within the United States.

9.      Termination; Effect of Termination.

        (a) This Agreement and all licenses will terminate: (a) upon the natural expiration of the Term; (b) thirty (30) days after notice from one party of any breach by the other party remaining uncured at the end of such notice period (Partner shall have the opportunity to cure a breach by a Licensee (or reseller or distributor) of Partner by demonstrating to Company's reasonable satisfaction termination of the activity causing such breach); or (c) immediately upon the insolvency, or commencement of any bankruptcy proceeding (or other insolvency proceeding), of PARTNER or the dissolution or change of control of PARTNER. PARTNER understands that after such termination date, it shall have no right whatsoever to continue as a dealer or distributor or licensee and that it will be entitled to no compensation in connection with any such termination.

        (b) Upon expiration or termination of this Agreement

Received Fax :   Aug 23 2004 7:14PM   Fax Station :   JINGLE DIGITAL   p. 9

BigFix Channel Agreement Number: _____

for any reason: (a) any licenses properly granted by PARTNER to Licensees hereunder (directly or indirectly through an authorized distributor or reseller) shall survive and remain in effect in accordance with their terms, provided that PARTNER is and remains in compliance with all restrictions and payment obligations herein; all other licenses and rights granted to PARTNER under this Agreement will become null and void, except that if termination is not for PARTNER's breach, PARTNER may retain a limited right to (A) use the Company Products solely to fulfill obligations to Licensees for routine maintenance and support services contracted for prior to such termination and (B) fill certain existing orders disclosed to and agreed upon by Company; (b) PARTNER will surrender all copies of Confidential Information, catalogs, literature and other Company materials in its possession or control, or at Company's option, destroy such materials and provide Company with a certificate signed by an executive officer attesting to the destruction thereof; and (c) all outstanding obligations or commitments of either party to pay amounts to the other party, if any, will become immediately due and payable. Sections 4, 6(c), 6(f), 6(g) and 8 through 13 of this Agreement, as well as PARTNER's end user support obligations hereunder, will survive termination. Termination is not an exclusive remedy and all other remedies will be available whether or not termination occurs. Each party understands that the rights of termination hereunder are absolute. Neither party shall incur any liability or compensation obligation whatsoever for any damage (including, without limitation, damage to or loss of goodwill or investment), loss or expenses of any kind suffered or incurred by the other (or for any compensation to the other) arising from or incident to any termination of this Agreement by such party that complies with the terms of this Agreement whether or not such party is aware of any such damage, loss, or expenses.

10.   Indemnification.  Company will hold PARTNER harmless from liability to third parties resulting from infringement by the Company Products of any U.S. patent (issued sixty (60) days or more before delivery of such Company Product to the PARTNER) or any U.S. copyright, or for misappropriation of any third party trade secrets, provided that Company is promptly notified of any and all threats, claims and proceedings related thereto, is given reasonable assistance, and has sole control over defense and settlement thereof. Company will not be responsible for any settlement it does not approve in writing. The foregoing obligations do not apply with respect to Company Products or portions or components thereof, (a) that are modified after delivery by Company, (b) combined with other products, processes or materials, where the alleged infringement relates to such combination, (c) where allegedly infringing activity continues after notification thereof or of modifications that would have avoided the alleged infringement, or (d) where use of such Company Product is not strictly in accordance with this Agreement. In the event that a Company Product is held to or is believed by Company to infringe, Company will have the option to (A) modify the Company Product to be non-infringing, (B) obtain for PARTNER a license to continue using the Company Product, or (C) terminate this Agreement as to the infringing Company Product and refund to PARTNER

the unamortized portion of the fees paid under this Agreement in respect of such infringing Company Product for the then-current Agreement Year. PARTNER will defend, indemnify and hold Company harmless against any claims, damages, settlements and expenses (including attorneys' fees): (i) excluded from Company's indemnity obligation; or (ii) arising out of any action or omission by PARTNER relating to the Company Products or the Trademarks (including any company name). The foregoing states the parties' entire rights and liabilities with respect to infringement of third party intellectual property rights.

11.   Limited Warranty and Disclaimer.  ANY LIABILITY OF COMPANY WITH RESPECT TO ANYTHING PROVIDED UNDER THIS AGREEMENT (WHETHER PRODUCT, SERVICE OR OTHERWISE) OR THE PERFORMANCE THEREOF UNDER ANY WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY WILL BE LIMITED EXCLUSIVELY TO REPLACEMENT OR, IF REPLACEMENT IS INADEQUATE AS A REMEDY OR, IN COMPANY'S OPINION, IMPRACTICAL, TO REFUND OF THE FEES PAID TO IT WITH RESPECT TO SUCH ITEM. OTHER THAN THE LIMITED WARRANTY MADE BY COMPANY TO END USERS IN COMPANY'S THEN CURRENT STANDARD END USER LICENSE AGREEMENT, EVERYTHING PROVIDED UNDER THIS AGREEMENT (WHETHER PRODUCT, SERVICE OR OTHERWISE) IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. FURTHER, COMPANY DOES NOT WARRANT RESULTS OF USE OR FREEDOM FROM BUGS OR UNINTERRUPTED USE OR ACCESS. NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, COMPANY DOES NOT WARRANT ANY MODIFICATION OR COMBINATION OF THE COMPANY PRODUCTS OR PORTIONS THEREOF MADE BY ANY PARTY OTHER THAN COMPANY. PARTNER will make no representation or warranty concerning the quality, performance or other characteristics of Product Components other than those which are consistent in all respects with, and do not expand the scope of, the warranties expressly stated herein.

12.   Limitation of Liability.  NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, AND EXCEPT FOR BODILY INJURY, COMPANY WILL NOT BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY (I) FOR ANY AMOUNTS IN EXCESS IN THE AGGREGATE OF THE FEES PAID TO IT HEREUNDER WITH RESPECT TO THE APPLICABLE COMPANY PRODUCT DURING THE TWELVE MONTH PERIOD PRIOR TO THE CAUSE OF ACTION, OR (II) FOR ANY COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY, SERVICES OR RIGHTS; (III) FOR ANY INCIDENTAL OR CONSEQUENTIAL

Received Fax          Aug 23 2004 7:14PM    Fax Station    JUNGLE DIGITAL          P.10

DAMAGES; (IV) FOR INTERRUPTION OF USE OR LOSS OR CORRUPTION OF DATA; OR (V) FOR ANY MATTER BEYOND ITS REASONABLE CONTROL.

15.    Miscellaneous.

(a) Company reserves the right to change its list prices subject to thirty (30) days notice in writing, and to change or discontinue any Company Products or BigFix Solutions or any services at any time, subject to ninety (90) days notice for discontinuation or major changes in writing.

(b) PARTNER shall comply with, and shall, at Company's request, demonstrate such compliance with, the U.S. Foreign Corrupt Practices Act and all applicable export laws, restrictions, and regulations of the U.S. Department of Commerce, the U.S. Department of Treasury and any other U.S. or foreign agency or authority. PARTNER will not export or re-export, or allow the export or re-export of any product, technology or information it obtains or learns pursuant to this Agreement (or any direct product thereof) in violation of any such law, restriction or regulation, including, without limitation, export or re-export to Cuba, Iran, Iraq, Libya, North Korea or any other country subject to U.S. trade embargoes, or to any party on the U.S. Export Administration Table of Denial Orders or the U.S. Department of Treasury List of Specially Designated Nationals, or to any prohibited destination in any of the Country Groups specified in the then current Supplement No. 1 to Part 740 or the Commerce Control List specified in the then current Supplement No. 1 to Part 738 of the U.S. Export Administration Regulations (or any successor supplement or regulations). PARTNER shall obtain and bear all expenses relating to any necessary licenses and/or exemptions with respect to the export from the U.S. of any Product to any location in compliance with all applicable laws and regulations prior to delivery thereof by Company. If PARTNER has any reason to suspect that any product, technology or information it obtains or learns pursuant to this Agreement will be exported, re-exported, or diverted in violation of any such laws, restrictions or regulations (including, without limitation, knowledge of suspect end users, abnormal transaction circumstances, or other Bureau of Export Administration "red flag" indicators), then PARTNER will take appropriate steps to terminate such transaction, notify the correct U.S. agency, and give notice to Company.

(c) This Agreement is not assignable or transferable by PARTNER (whether by sale, merger, reorganization, change of control or otherwise) in whole or in part without the prior written consent of Company; any attempt to do so will be null and void. This Agreement is freely assignable by Company and the Company will inform the Partner promptly of any suchassignment.

(d) The parties agree that they are each independent contractors and nothing in this Agreement will be deemed to establish a joint venture, partnership, agency or employment relationship between the parties. Neither party has the right or authority to assume or create any obligation or responsibility on behalf of the other. Further, the parties hereto expressly understand and agree that Partner is an independent contractor in the performance of each and every part of this Agreement, is

solely responsible for all of its employees and agents and its labor costs and expenses (including, without limitation, tax withholding obligations) arising in connection therewith and is responsible for and will indemnify Company from any and all claims, liabilities, damages, debts, settlements, costs, attorneys' fees, expenses and liabilities of any type whatsoever that may arise on account of Partner's activities hereunder, or those of its employees or agents (including, without limitation, direct and indirect resellers and distributors), including without limitation, providing unauthorized representations or warranties (or failing to effectively disclaim all warranties and liabilities on behalf of Company) to its Licensees or breaching any term, representation or warranty of this Agreement.

(e) Any notice to be given under this Agreement shall be provided in writing by hand, certified or registered mail, recognized internationally courier service or facsimile (with receipt confirmed), to the person listed below, and at the address listed above or such address or person as may be indicated in writing in accordance with this provision. Any waivers or amendments will be effective only if made in writing. Any different or additional terms of any purchase order, confirmation, or similar form, even if signed by the parties after the date hereof, will have no force or effect.

(f) If any provision of this Agreement is unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable. This Agreement will be construed under the laws of the State of California, without regard to conflicts of laws provisions thereof and the parties hereby irrevocably consent to the jurisdiction of the federal and state courts located in the Northern District of California. This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes all previous written and oral agreements and communications relating to the subject matter of this Agreement, except that notices in the documentation apply to certain third party software. In any action relating to the subject matter of this Agreement, the prevailing party will be entitled to recover reasonable legal fees and related costs.

(g) This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

GDSVF&H\552259.1

Received Fax          Aug 23 2004 7:52PM      Fax Station : JUNGLE DIGITAL                Page 11

BigFix Channel Agreement Number: _____

## Exhibit A

### Prices and Fees

**A.**     **Fees:**

1.   Partner shall pay Company (in accordance with Paragraph B below) forty percent (40%) of Partner's Product Bookings (defined as total gross revenues collected by, or due and payable to, PARTNER by Licensees of PARTNER (or its authorized distributors or resellers) for the sale of licenses and subscriptions to Company Products & BigFix Solutions hereunder, including, without limitation, BDE-Enablement Fees, installment payments of fees for any multi-year licenses or subscriptions, and fees collected in connection with renewals of any license or subscription, and support and maintenance fees collected in connection with any Perpetual License ), provided that the amount paid to Company shall in no event (except as allowed pursuant to Section 6 below) be less than twenty percent (20%) of Company's then-current U.S. list price (the current version as of the Effective Date is attached hereto as Exhibit A-1) for the applicable Company Product or BigFix Solution; and

2.   Partner shall pay Company (in accordance with Paragraph B below) fifteen percent (15%) of Partner's Services Bookings (defined as gross revenues collected for authorized product training and technical certification courses) provided in connection with the Company Products, whether to Licensees, to Partner's authorized resellers or distributors, or otherwise (such as by referral). For avoidance of doubt, Territory pricing for training and technical certification are at Partner's discretion.

3.   Partner's discounted pricing for the Platform and Client Compliance APIs or Perpetual Licenses shall be mutually agreed if and when Company makes such products available hereunder.

4.   Pricing for New Products or new BigFix Solutions shall be determined by Company upon release thereof.

5.   For avoidance of doubt, the parties agree that, in the event that Company is obligated to pay royalties to any third party in connection with any New Product or new BigFix Solution, the third party obligation will be taken into account in determining the discount granted to Partner hereunder with respect to that New Product (i.e. Company's third party royalty obligation will be subtracted from the total fees due or payable to Partner in connection with the New Product or new BigFix Solution before the forty percent (40%) payable to Company is calculated. Based on this calculation Partner will remit to Company the adjusted 40% fee plus the third party royalty obligation).

6. In the event that Partner demonstrates to Company's reasonable satisfaction that specific opportunities or market conditions in a particular portion of the Territory require an increase in the maximum discount allowed to Partner in Paragraphs A.1 or A.2 above for transactions in that portion of the Territory, Company agrees to negotiate in good faith towards an appropriate adjustment of Partner's discount for that portion of the Territory only.

**B.**     **Reporting & Payment:** By the process of submitting the Licensing Term Sheets, Partner shall report all transactions involving either Product Bookings or Services Bookings to Company. Partner shall pay Company within ninety (90) days following delivery of the relevant products or services to Licensee, (or following the relevant anniversary, installment, or renewal date, if applicable), in each case whether or not Partner has received payment.



Received Fax         Apr 23 2004 7:14PM    Fax Station    JUNGLE DIGITAL         p. 12

BigFix Channel Agreement Number: _____

## Exhibit B

### Requirements to Retain Exclusivity

**I. Business Targets**

**Minimum Targets for Territory (as a whole):** In order to retain exclusivity in the Territory, Partner's Product Bookings must at least equal or exceed the following targets, but failure to meet such Minimum Targets for the Territory will not result in Partner's loss of exclusivity in any Region for which each of the Minimum Targets for that Region (as set forth below) have been met:

- $US 1,250,000.00 for the period from the Effective Date through December 31, 2005
- $US 2,500,000.00 for the period from 01-January-2006 through 31-December-2006
- $US 4,000,000.00 for the period of 01-January-2007 through 31-December-2007.
- $US 5,750,000.00 for the period of 01-January-2008 through 31-December-2008.

For avoidance of doubt, no revenues from authorized training / technical certification courses, professional services, support and maintenance fees or renewal fees (whether or not Company is entitled to a percentage of such revenues) shall be applied against any Minimum Target. Multi-year or Perpetual License fees may be credited against Minimum Targets only in the amount equal to the applicable pro-rated annual fee (which for Perpetual Licenses are calculated over a three (3) year period). Thus, the Minimum Targets may be satisfied by Product Bookings for new licenses only.

**Minimum Targets for Regions:** Minimum targets shall also be in force for Partner's Product Bookings out of the respective Regions as set forth below. If the percentage of Product Bookings from a Region against the applicable Minimum Target for the Territory (as set forth above) is less than the applicable Minimum Target set forth below, then that Region is subject to review and definition of an mutually agreed action plan for each quarter during the subsequent 12 months, and, if the Minimum Target set forth in the relevant quarterly action plan is not met in any such quarter, the Partner's rights with respect to that Region shall become non-exclusive.

**Greater China:** for the period from the Effective Date to 31-Dec-2005: either 30% or USD 375,000.00, for the period from 01-Jan-2006 to 31-Dec-2006: either 35% or USD 875,000.00, for the period from 01-Jan-2007 to 31-Dec 2007: either 40% or USD 1,600,000.00 and for the period from 01-Jan-2008 to 31-Dec-2008: either 40% or USD 2,300,000.00.

**ASEAN:** for the period from the Effective Date to 31-Dec-2005: either 35% or USD 437,500.00, for the period from 01-Jan-2006 to 31-Dec-2006: either 30% or USD 750,000.00, for the period from 01-Jan-2007 to 31-Dec-2007: either 25% or USD 1,000,000.00 and for the period from 01-Jan-2008 to 31-Dec-2008: either 25% or USD 1,437,500.00.

**Australasia:** for the period from the Effective date to 31-Dec-2005: either 15% or USD 187,500.00, for the period from 01-Jan-2006 to 31-Dec-2006: either 15% or USD 375,000.00, for the period from 01-Jan-2007 to 31-Dec-2007: either 15% or USD 600,000.00 and for the period from 01-Jan-2008 to 31-Dec-2008: either 15% or USD 862,500.00.

**South Asia:** for the period from the Effective Date to 31-Dec-2005: either 20% or USD 250,000.00, for period from 01-Jan-2006 to 31-Dec-2006: either 20% or USD 500,000.00, for the period from 01-Jan-2007 to 31-Dec-2007: either 20% or USD 800,000.00 and for the period from 01-Jan-2008 to 31-Dec-2008: either 20% or USD1,150,000.00.

P.12

Received Fax :    Aug 23 2004 7:14PM    Fax Station : JUNGLE DIGITAL    P. 13

BigFix Channel Agreement Number: _____

**II.**  **Change of Ownership / Control & Key Personnel**

- Upon any change of control or ownership of fifty percent or more of an entity's business, stock or assets (whether by sale, assignment, transfer, merger, reorganization, or otherwise) (a "Change of Control") of PARTNER or the Operating Entity Company may, at Company's discretion,    terminate Partner's exclusivity in the Territory. Further, Company shall have a right of first refusal with respect to any transaction that triggers a Change of Control of Partner or the Operating Entity.

- If within one hundred eighty (180) days after the Effective Date Chaw Chong Foo's employment has not commenced, or upon termination of employment and/or primary commitment of activities by key executive Mr. Chaw Chong Foo, Company may terminate Partner's exclusivity in the Territory, or terminate the Agreement, at Company's sole discretion regarding successor management, by giving ninety (90) days notice.

Received Fax ... Aug 23 2004 2:14PM Fax Station ... JUNGLE DIGITAL ... p. 14

BigFix Channel Agreement Number: _____

## Exhibit C

### PARTNER'S SUPPORT AND MAINTENANCE SERVICES TERMS AND CONDITIONS

To the extent the Agreement provides for support and maintenance by Company to PARTNER on Company's standard terms, the following will apply so long as they remain Company's standard terms and the PARTNER is in full compliance with the Agreement. Capitalized terms not defined in Section 4 below have the same meaning as in the Agreement.

1.   SUPPORT AND MAINTENANCE SERVICES. and Maintenance Services consist of (a) Issue Correction and Telephone Support provided to any PARTNER's trained technical support contacts concerning the installation and use of the then current release of a Company Product and the Previous Sequential Release, (b) E-mail Support (c) Web Support, and (d) product component updates that Company in its discretion makes generally available to its channel support and maintenance customers without additional charge.

2.   ERROR PRIORITY LEVELS. Company shall exercise commercially reasonable efforts to correct any Issue reported by PARTNER in the current unmodified release of a Company Product in accordance with the severity level reasonably assigned to such Issue by Company. Company will use commercially reasonable efforts to initially respond to Issues reported by Licensee during Telephone Support hours within the target response times indicated below; however, these are targets only and are not a guarantee by Company that resolution will be possible during such time.

* Severity 1 Issues - Company shall promptly commence the following procedures: (i) assign Company engineers to correct the Issue; (ii) notify Company management that such Issues have been reported and of steps being taken to correct such Issue(s); (iii) provide PARTNER with periodic reports on the status of the corrections; (iv) initiate work to provide PARTNER with a Workaround or Fix; and (v) will continue such commercially reasonable efforts until a Workaround or Fix has been made available to Licensee. Target initial response time: same business day.

* Severity 2 Issues - Company shall exercise commercially reasonable efforts to include the Fix for the Issue in the next regular Company Product maintenance release. Target initial response time: one business day.

* Severity 3 Issues - Company may include the Fix for the Issue in the next major release of the Company Product. Target initial response time: two business days

* Severity 4 Issues - Company will provide relevant information to PARTNER. Target initial response time: three business days.

If Company believes that a problem reported by PARTNER may not be due to an Issue in a Company Product, Company will so notify PARTNER. At that time, PARTNER may (1) instruct Company to proceed with problem determination at its possible expense as set forth below, or (2) instruct Company that PARTNER does not wish the problem pursued at its possible expense. If PARTNER requests that Company proceed with problem determination at its possible expense and Company determines that the error was not due to an Issue with the Company Product, PARTNER shall pay Company, at Company's then-current and standard consulting rates, for all work performed in connection with such determination, plus reasonable related expenses incurred therewith. However, Company must get prior approval from Chew Chong Foo before any costs or expenses are incurred and the total expenses and costs shall subject to a maximum of USD 10,000.00.   PARTNER shall not be liable for (i) problem determination or repair to the extent problems are due to Issues with the Company Product; or (ii) work performed under this paragraph in excess of its instructions; or (iii) work performed after PARTNER has notified Company that it no longer wishes work on the problem determination to be continued at its possible expense (such notice shall be deemed given when actually received by Company). If PARTNER instructs Company that it does not wish the problem pursued at its possible expense or if such determination requires effort in excess of PARTNER's instructions, Company may, at its sole discretion, elect not to investigate the problem with no liability therefor.

3.   EXCLUSIONS. Company shall have no obligation to support: (i) altered or damaged Company Products or any portion of a Company Product incorporated with or into other software; (ii) any Company Product that is not the then current release or immediately Previous Sequential Release (or a release made generally available by Company during the previous twelve (12) months); (iii) problems caused by PARTNER's or any Licensee's negligence, abuse or misapplication, use of Company Products other than as specified in the Company's user manual or other causes beyond the control of Company; or (iv) Company Products installed on any hardware that is not supported by Company. Company shall have no liability for any changes in PARTNER's or any Licensee's hardware which may be necessary to use Company Products due to a Workaround or maintenance release.

4.   DEFINITIONS.

* "E-mail support" means ability to make requests for technical support assistance by e-mail at any time (with reasonable efforts by Company to respond

P. 14

Received Fax         Aug 23 2004 7:14PM     Fax Station : JUNGLE DIGITAL                    Page 15

BigFix Channel Agreement Number: _____

within one business day) concerning the installation and use of the then current release of a Company Product and the Previous Sequential Release.

- "Fix" means the repair or replacement of object or executable code versions of a Company Product or documentation to remedy an Issue.

- "Issue" means an error in a Company Product which significantly degrades such Company Product as compared to the Company's published performance specifications.

- "Issue Correction" means the use of reasonable commercial efforts to correct Issues.

- "Previous Sequential Release" means the release of a Company Product which has been replaced by a subsequent release of the same Company Product. Notwithstanding anything else, a Previous Sequential Release will be supported by Company only for a period of 12 months after release of the subsequent release.

- "Severity 1 Issue" means an Issue which renders the core functionality of a Company Product inoperative.

- "Severity 2 Issue" means an Issue which substantially degrades the performance of a Company Product or materially restricts the Licensee's use of such Company Product.

- "Severity 3 Issue" means an Issue which causes only a minor impact on the Licensee's use of a Company Product.

- "Severity 4 Issue" means an inquiry regarding capabilities of the Company Products; Licensee's use of the Company Products is not impeded.

- "Telephone Support" means technical support telephone assistance, in English, between 6:00AM and 9:00PM Pacific Time on Company's regular business days concerning the installation and use of the then current release of a Company Product and the Previous Sequential Release.

- "Web Support" means information available on the World Wide Web, including frequently asked questions, product documentation and bug reporting.

- "Workaround" means a change in the procedures followed or data supplied by a user to avoid an Issue without substantially impairing use of a Company Product.

THESE TERMS AND CONDITIONS CONSTITUTE A SERVICE CONTRACT AND NOT A PRODUCT WARRANTY. ALL PRODUCTS AND MATERIALS RELATED THERETO ARE SUBJECT EXCLUSIVELY TO THE WARRANTIES SET FORTH IN THE AGREEMENT. THIS ATTACHMENT IS AN ADDITIONAL PART OF THE AGREEMENT AND DOES NOT CHANGE OR SUPERSEDE ANY TERM OF THE AGREEMENT EXCEPT TO THE EXTENT UNAMBIGUOUSLY CONTRARY THERETO.

P. 15

Received By:    Aug 23 2004 7:14PM    Fox Station    JUNGLE DIGITAL    P    16

BigFix Channel Agreement Number: _____

## Exhibit D

### Technical Certification Services, Requirements and Authorizations

**Technical Authorizations:**

Two of PARTNER'S employees will attend each of the certification courses listed below at no charge. PARTNER must at all times during the term of this Agreement (and for so long thereafter as PARTNER has outstanding end user support obligations) has two individual full time employees who have completed each of the following: (1) BES Implementer Certification Course; (2) Content Authoring Certification Course(s); and (3) Technical Support Certification Course. Such certification training shall be provided at no additional charge to Partner at Company headquarters for its personnel with whom it satisfies the requirement. Further, recognizing substantial geographic distances between Partner and Company headquarters, certification requirements such as for 'on site project review' shall be amended to make use of substitute telecommunication or correspondence to the extent Company deems practicable. Finally, it is expected that visiting Company personnel may administer certification steps to Partner's staff at Partner's premises at no charge.

**Authorized Training Center:** Partner is required to attain status as an Authorized Training Center for full line of Company product training.

The above authorizations shall require completion, to Company's satisfaction, of Company's defined 'certification' training and successful post-training confirmation testing.

**Rights to Confirm Authorization to Partners:** Once it has obtained its own relevant certifications, Partner shall be able to confirm 'authorization' of its partners to offer each of the following in Territory, subject to each such partners' meeting authorization criteria at the standard required by Company for:

- Authorized Training Center
- Authorized Technical Support
- Authorized Project Implementation Consulting.

Partner shall administer the above authorizations in line with Company's defined minimum standards for 'certification' training and successful post-training confirmation testing and shall report each authorization to Company upon completion. Company reserves the right to revoke any such authorization by Partner based on any non-compliance with Company's standards that persists after thirty (30) days written notice to the authorized partner.

**Commissions based on Partner Referrals to Company for Professional Services:** If Partner refers (meaning sets up a meeting between Company and the appropriate decision makers of) a Licensee in the Territory to Company for any of Company's standard Professional Services offerings (as set forth on the cover sheet of Company's end user license agreement), and such Professional Services are performed as a result of such referral, then Company shall pay Partner a commission of fifteen percent (15%) of the fees paid to Company for the performance of such Professional Services thirty (30) days after Company's receipt of full payment (provided that this applies only to payments received by Company within 12 months after the referral under a contract entered within 6 months of such referral). The amount of any such commission shall not be applied against any Minimum Target for a Region or for the Territory.

P. 16

BigFix Channel Agreement Number: _____

**Exhibit E**

**LICENSEE TERM SHEET**

**(This Exhibit is an example of that Required of Partner for each Licensee transaction)**

This Licensee Term Sheet details BigFix products/services to be licensed/subscribed to by the "Licensee" designated below starting        , 200  ("Effective Date").

| PARTNER: |
|---|

| Licensee: | Contact: |
|---|---|
| Main Address: | Phone: |
| Fax: | E-mail: |

**License Certificate Delivery Information**

| Delivery Contact Name: | Phone: |
|---|---|
| Address: | E-mail: |
| Delivery Completed (to be filled in by BigFix): | |

**Initial Product and Fee Schedule**

Effective Date: ▓▓▓▓▓▓▓▓

Term of this Initial Fee Schedule: ☐ 1 year, ☐ 2 years, ☐ and 3 years from the "Effective Date", subject to automatic annual renewals thereafter unless either party provides notice of nonrenewal at least 60 days prior to any such renewal.

| BIGFIX PLATFORM AND AGENTS: | Licensed Machines (LM) | Subscription Fee per LM | Fee paid to BigFix per LM | Total Fee Paid to BigFix |
|---|---|---|---|---|
| ☐ BES Client, Windows | | | | |
| ☐ BES Client, non-Windows | | | | |

P.17 ～Caw
CWB

GDSVF&H\652259.1

Received Fax :    Aug 23 2004 7:14PM    Fax Station : JUNGLE DIGITAL    Page 18

BigFix Channel Agreement Number: _____

| BIGFIX SOLUTIONS: | | | | |
|---|---|---|---|---|
| ☐ Patch Manager, English OS | | | | |
| ☐ Patch Manager, non-English OS | | | | |
| ☐ Patch Manager, non-Windows, | | | | |
| ☐ VIR Manager, Windows, English OS | | | | |
| ☐ Client Manager for AntiVirus, English OS | | | | |
| ☐ Client Manager for MS SMS, English OS | | | | |
| ☐ Configuration Manager | | | | |
| Total BigFix Platform, Agents and Solutions | | | | |

| PROFESSIONAL SERVICES: | Quantity | End User Fee/Unit | BigFix Fee/Unit | Total BigFix Fee |
|---|---|---|---|---|
| ☐ BES Implementation Services | | | | |
| ☐ BES User Training | | | | |
| ☐ Configuration Manager: Fixlet Message Authoring Training | | | | |
| ☐ Custom Fixlet Message Developments | | | | |
| ☐ Consulting Services | | | | |

P. 18

GDSVF&H\552259.1

Received Fax    Aug 23 2004 7:14PM    Fax Station    JUNGLE DIGITAL    P. 19

BigFix Channel Agreement Number: _____

| | | | |
|---|---|---|---|
| Total Professional Services | | | |
| GRAND TOTAL | | | |

Additional Terms and mutually executed Addenda specified here control over

expressly contrary provisions of the Terms and Conditions:

[[e.g. grant of any Perpetual License or rights to act as an MSP, each as defined in BigFix's standard end user license agreement]]

[[BDB Enablement Fees; CM Tool Fees, if not included above]]


PARTNER represents that it has entered into appropriate agreements reflecting the foregoing, with the Licensee shown above, in accordance with the Master BES Distributor Agreement.

By: _____    Title: _____

Name: _____    Date: _____

P. 19

Received Fax       Aug 23 2004 7:54PM    Fax Station 4   JUNGLE DIGITAL           page 20

BigFix Channel Agreement Number: ___

## Exhibit F

### MASTER BIGFIX ENTERPRISE SUITE (BES) SOFTWARE LICENSE AGREEMENT

This Agreement is made between BigFix, Inc., a Delaware corporation with an office at 5915 Hollis Street Emeryville, California 94608 (Phone: (510) 652-6700; Fax: (510) 652-6742; E-mail: legal@bigfix.com) ("Company") and the "Licensee" designated below.

| Licensee: | Contact: |
|---|---|
| Address: | Phone: |
| E-mail: | Fax: |

**License Certificate Delivery**

| Delivery Contact Name: | Phone: |
|---|---|
| Address: | E-mail: |
| Delivery Completed (to be filled in by BigFix): | |

**Example of Initial Product and Fee Schedule**

| Effective Date:      , 2004 | | | |
|---|---|---|---|
| Term of this Initial Product and Fee Schedule: ☐ 1 year, ☐ 2 years, or ☐ 3 years from the Effective Date set forth above, subject to automatic annual renewals thereafter unless either party provides notice of non-renewal at least 60 days prior to any such renewal. | | | |
| **BIGFIX PLATFORM AND AGENT:**<br><br>☐ BES Client, Windows<br><br>☐ BES Client, non-Windows | Licensed Machines | Subscription Fee per Licensed Machine | Total Subscription Fee |

Received Fax :        Aug 23 2004 7:14PM    Fax Station :  JUNGLE DIGITAL          p. 21

BigFix Channel Agreement Number: _____

| BIGFIX SOLUTIONS: | | | |
|---|---|---|---|
| ☐ Patch Manager, English OS | | | |
| ☐ Patch Manager, non-English OS | | | |
| ☐ Patch Manager, non-Windows, | | | |
| ☐ VLR Manager, Windows, English OS | | | |
| ☐ Client Manager for AntiVirus, English OS | | | |
| ☐ Client Manager for MS SMS, English OS | | | |
| ☐ Configuration Manager | | | |
| Total Subscription Fees for BigFix Platform, Agents and Solutions for the initial Term set forth above (includes Support and Maintenance Services): | | | |

| PROFESSIONAL SERVICES: | Fee |
|---|---|
| ☐ BES Implementation: Planning, deployment and optimization of BES installation; includes training of BES site administrator., includes [　] days for [　] Agents | |
| ☐ BES User Training: BES Console operator training and BES Web Reports training for Licensee employees or contractors; includes [　] 1 day training sessions for up to 12 attendees. | |
| ☐ Configuration Manager Authoring Training: Training for Licensee employees or contractors to create Fixlet Messages for internal use only, using the BigFix Development Environment; includes [　] 3 day training sessions for up to 5 attendees. | |
| ☐ Custom Fixlet Message Development: Identifying and correcting specific configuration management problems for the Licensee.[Project description to be mutually agreed upon] | |
| ☐ Consulting Services: [Project description to be mutually agreed upon] | |

GDSVF&HW72890.6
BigFix Master License Agreement

BigFix Channel Agreement Number: _____

| | |
|---|---|
| Total Professional Services | |
| GRAND TOTAL | |
| Additional Terms and mutually executed Addenda specified here control over expressly contrary provisions of the Terms and Conditions: [[e.g. grant of any Perpetual License or rights to act as an MSP (each as defined below)]] ][BDE Enablement Fees; CM Tool Fees, if not included above]] | |

This Agreement includes the attached Terms and Conditions, the Company's applicable Support and Maintenance Services Terms and Conditions, and all mutually executed Additions Schedules and Addenda and contains, among other things, warranty disclaimers, liability limitations and use limitations. For additional products, subscriptions and services, attach a mutually executed Additions Schedule in Company's standard form. Any different or additional terms of any related purchase order, confirmation, or similar form even if signed by the parties after the date hereof shall have no force or effect.

Licensee:                                       Company:

By: _____    By: _____

Name: _____    Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

Received Fax    Aug 23 2004 7:14PM    Fax Station    JUNGLE DIGITAL    p. 23

BigFix Channel Agreement Number: _____

### Example of LICENSEE'S TERMS AND CONDITIONS Required for Partner's Licensees

1. **Certain Definitions.** Capitalized terms will have the meaning indicated above or on an Additions Schedule unless more specifically defined herein. "Product Components" shall mean the BES Server, the BES Console and any related proprietary software or materials provided by Company in connection with a BigFix Solution (collectively, the "BigFix Platform") and the BES Client ("BigFix Agent"). "BigFix Solution" shall mean a subscription to a "Content Site" (defined as any site maintained by the Company or an authorized third party which provides Fixlet Messages (defined below) for use in connection with the Product Components. The BigFix Solution called Configuration Manager shall also include the BigFix Development Environment ("BDE"), and for Licensees who have paid for a subscription to Configuration Manager only, BDE shall be treated as a Product Component for purposes of this Agreement. "Fixlet Messages" shall mean digital files (developed by Licensee under the License or properly obtained from Company or a third party authorized by Company to so provide such files) containing some or all of the following elements: (A) a relevance clause written in the Company's proprietary relevance language which describes attributes of a computer system, its content or environment, or such other factors as may be supported by the Company from time to time; (B) text that is displayed to the BES Console operator which describes a particular condition or failure; and (C) computer system intelligible components which contain some form of action to remediate the discovered issue, all of which shall be in a format consistent with the standards set from time to time by the Company.

2. **Grant of Limited License.** Subject to all the terms of and timely payment of all fees under this Agreement, Company grants Licensee the nonsublicensable, nonexclusive, right (the "License") to [(i) allow Licensee employees and contractors to use the Product Components designated above or on Additions Schedules in object code form only and only on the numbers of machines licensed as specified above or on such Additions Schedules for each applicable Product Component("Licensed Machines") and, if Configuration Manager is specifically included above or on an applicable Additions Schedule, this includes the right to use BDE in object code form only to develop Fixlet Messages for internal use on BDE-Enabled Machines only (whether new or derivatives of existing Fixlet Messages), (ii) distribute copies of the Product Components and Fixlet Messages only so, and only for internal use on, Licensed Machines (in the case of Fixlet Messages authored by Licensee or obtained from an authorized third party, this distribution right is limited to BDE-Enabled Machines), and (iii) access and download Fixlet Messages (using licensed Product Components in accordance with Company's then current access procedures) from any Content Site for which Licensee has a then-effective subscription for which Company has been paid the applicable Subscription Fees, and any applicable BDE runtime enablement fees, as specified above or in an Additions Schedule.](*Only if Licensee has obtained this license as a managed service provider, the following bracketed provision shall replace the bracketed subsections 2(i)-(iii) above:*)[(i) allow

Licensee employees and contractors to use the Company Products designated above or on an Additions Schedule in object code form only and only internally on properly Licensed Machines and, in the case of BDE, this includes the right to develop Fixlet Messages for use on BDE-Enabled Machines only (whether new or derivatives of existing Fixlet Messages), (2) distribute copies of the BigFix Agent, BES Relay Server and Fixlet Messages to MSP Customers (defined as managed service customers of Licensee who are bound, for the Company's benefit, by an end user license agreement at least as protective of Company and its intellectual property as the Company's standard applicable end user agreement) for use on such MSP Customers' Licensed Machines (in the case of Fixlet Messages authored by Licensee or obtained from an authorized third party, this distribution right is limited to BDE-Enabled Machines), and (3) access and download Fixlet Messages (using licensed Product Components in accordance with Company's then current access procedures) from any Content Site designated above and on the applicable Additions Schedule for which Licensee has a then effective subscription for which Company has been paid the applicable subscription fees and any applicable BDE runtime enablement fees.]

Any activity contemplated by the License shall be strictly in accordance with and subject to Company's applicable user documentation and, in the case of Fixlet Messages obtained from Company or third parties (or derivatives thereof), any limitations and conditions under which those Fixlet Messages were obtained, as well as any applicable third party rights, the term of the License or subscription with respect to any Product Component, Fixlet Message, BigFix Solution or Content Site shall be limited to the period specified above or in the applicable Additions Schedule for which Company has received full payment. Each "Product Component" will include updates thereto that the Company provides to Licensee as part of Support and Maintenance Services (defined below). [[*Use the following bracketed provision when a "Perpetual License" is granted*]] [If, as specifically indicated above or on an applicable Additions Schedule, Licensee's rights to use the BigFix Platform and BigFix Agent, have been granted on a perpetual basis ("Perpetual License"), Licensee acknowledges and agrees that such Perpetual License is subject to Section 9 of this Agreement and that Company's obligation to provide access to any Content Sites, Fixlet Messages, or Support and Maintenance Services shall be limited to the subscription or maintenance period for which Licensee has received full payment and that Licensee shall not be entitled to any of the foregoing as part of a Perpetual License.]

3. **Standard Implementation Services; Additional Professional Services.** If Licensee has selected a Standard Implementation Services Package above or on the applicable Additions Schedule, Company agrees to use reasonable commercial efforts for the maximum hours included in such package to install the applicable Product Components. Company will use reasonable efforts to provide, and Licensee will pay for, any additional Professional Services specified above or on an Additions



BigFix Channel Agreement Number: _____

Schedule or otherwise agreed upon in writing by the parties.

4.    Restrictions.    Licensee will maintain the copyright notice and any other notices that appear on any Product Component or Fixlet Message on any copies and any media. Licensee will not (and will not allow any third party to) (i) reverse engineer or attempt to discover any source code or underlying ideas or algorithms of any Product Component or Fixlet Message (except to the extent that applicable law prohibits reverse engineering restrictions), (ii) provide, lease, lend, use for timesharing or service bureau purposes or otherwise use or allow others to use a Product Component or Fixlet Message for the benefit of any third party, or (iii) use any Product Component or Fixlet Message, or allow the transfer, transmission, export, or re-export of any Product Component or Fixlet Message or any portion thereof in violation of any export control laws or regulations administered by the U.S. Commerce Department, OFAC, or any other government agency. All the limitations and restrictions on Product Components or Fixlet Messages in this Agreement also apply to documentation.

5.    Support and Maintenance.    While the License for a Product Component and a subscription to at least one BigFix Solution remains effective, as specified above or applicable Additions Schedule and subject to the timely payment of all fees under this Agreement, Company will use reasonable commercial efforts to provide the support and maintenance services for that Product Component as described in Company's then standard applicable support and maintenance terms and conditions ("Support and Maintenance Services"), the current version of which is attached. Any such Support and Maintenance Services or implementation, training or additional services that may be made available by the Company hereunder shall become part of the Product Components or BigFix Solutions and subject to this Agreement.

6.    Reporting.    Licensee will promptly supply Company with information relating to the Product Components, Fixlet Messages, BigFix Solutions, Content Site subscriptions or this Agreement that is reasonably requested from time to time by Company (including, without limitation, the Internet protocol addresses of all Licensee servers on which the BigFix Platform is operating).

7.    Delivery.    All Product Components shall be delivered by Company in electronic format only and in accordance with Company's standard procedures, unless otherwise agreed by the parties.

8.    Fees and Payment.    Unless otherwise specified on an applicable schedule, fees are determined at the time of execution of the foregoing and of any Additions Schedule, and fees for any renewal period shall be determined in accordance with the Company's then-current standard price list. Except for fees for specified Professional Services (which are due upon invoice), all fees specified above or on

an Additions Schedule (including all initial subscription fees) are due upon execution of the foregoing schedule or the applicable Additions Schedule. All fees applicable to a renewal period are due thirty days after the expiration of the Term set forth on the foregoing or the applicable Additions Schedule or the expiration of the then-current renewal period. Further, if Licensee's use or distribution of Product Components, Fixlet Messages or subscriptions during any annual period exceeds that authorized herein for such period, in addition to any other remedies, Licensee will promptly pay all fees that would have been due (at Company's then standard rates) if such use and distribution had been authorized for such period. All payments shall be made inside the U.S., in U.S. dollars.    In addition, Licensee will pay all travel-related expenses, freight, taxes, duties, and the like promptly upon invoice. Licensee will maintain, and Company will be entitled to audit on reasonable notice, any records relevant to payments; if any audit reveals a 5% or greater underpayment, Licensee will bear the cost of such audit. Licensee acknowledges that the Product Components contain a routine to permit Company to disable the Product Components remotely if Licensee fails to pay any fees when they are due, or otherwise breaches any term of this Agreement, and Licensee hereby gives Company the right to disable the Product Components under such circumstances and shall have no claim against Company for any damages incurred as a result of such action by Company.

9.    Termination.    This Agreement shall remain in effect except as specified below. However, the License [Include the following bracketed language only when a Perpetual License has been granted] (except any Perpetual License (as defined in Section 2)) and any subscriptions and Licensee's related rights will terminate with respect to any Product Component, BigFix Solution, Content Site subscription or service referred to in the original schedule above or an Additions Schedule, as well as any related Fixlet Messages, upon expiration of the Term specified therein. In addition, this Agreement and all licenses, subscriptions and services will terminate thirty days (ten in the case of non-payment) after notice of any breach by Licensee remaining uncured at the end of such notice period, and immediately in the case of a breach of Section 2. Upon any full or partial termination, Licensee shall immediately cease all use of all affected Product Components, BigFix Solutions, and Content Site subscriptions as well as any related Fixlet Messages and destroy all copies of all affected Product Components and Fixlet Messages and all portions thereof and so certify to Company. Except as otherwise expressly provided herein, the terms of the Agreement shall survive termination. Termination is not an exclusive remedy and all other remedies will be available whether or not termination occurs.

10.    Indemnification.    Company shall hold Licensee harmless from liability to third parties resulting from infringement by a Product Component of any United States patent issued sixty (60) days or more before delivery of such Product Component or any copyright or misappropriation of any trade secret, provided Company is

BigFix Channel Agreement Number: _____

patent issued sixty (60) days or more before delivery of such Product Component or any copyright or misappropriation of any trade secret, provided Company is promptly notified of any and all threats, claims and proceedings related thereto and given reasonable assistance and the opportunity to assume sole control over defense and settlement; Company will not be responsible for any settlement it does not approve in writing. The foregoing obligations do not apply with respect to a Product Component or portions thereof (i) not supplied by Company, (ii) made in whole or in part in accordance to Licensee specifications, (iii) that are modified after delivery by Company, (iv) combined with other products, processes or materials where the alleged infringement relates to such combination, (v) where Licensee continues allegedly infringing activity after being notified thereof or after being informed of modifications that would have avoided the alleged infringement, or (vi) where Licensee's use of such Product Component is not strictly in accordance with this Agreement. Licensee will indemnify Company for all damages, settlements, attorneys' fees and expenses related to any claim of infringement or misappropriation specifically excluded from Company's indemnity obligation by the immediately preceding sentence.

11.    Limited Warranty and Disclaimer. Company warrants for a period of thirty (30) days from Licensee's first acquisition of a Product Component that such Product Component will materially conform to Company's applicable user documentation for such Product Component. This warranty covers only problems reported to Company during the warranty period. ANY LIABILITY OF COMPANY WITH RESPECT TO ANYTHING PROVIDED UNDER THIS AGREEMENT (WHETHER PRODUCT, SERVICE OR OTHERWISE) OR THE PERFORMANCE THEREOF UNDER ANY WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY WILL BE LIMITED EXCLUSIVELY TO REPLACEMENT OR, IF REPLACEMENT IS INADEQUATE AS A REMEDY OR, IN COMPANY'S OPINION, IMPRACTICAL, TO REFUND OF THE LICENSE FEE. EXCEPT FOR THE FOREGOING, EVERYTHING PROVIDED UNDER THIS AGREEMENT (WHETHER PRODUCT, SERVICE OR OTHERWISE) IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. FURTHER, COMPANY DOES NOT WARRANT RESULTS OF USE OR FREEDOM FROM BUGS OR UNINTERRUPTED USE OR ACCESS NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, COMPANY DOES NOT WARRANT ANY MODIFICATION OR COMBINATION OF THE COMPANY PRODUCTS OR PORTIONS THEREOF MADE BY ANY PARTY OTHER THAN COMPANY.

12.    Limitation of Liability. NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, AND EXCEPT FOR BODILY INJURY,

COMPANY SHALL NOT BE LIABLE OR OBLIGATED WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY (I) FOR ANY AMOUNTS IN EXCESS IN THE AGGREGATE OF THE FEES PAID TO IT HEREUNDER WITH RESPECT TO THE APPLICABLE PRODUCT COMPONENT DURING THE TWELVE MONTH PERIOD PRIOR TO THE CAUSE OF ACTION, OR (II) FOR ANY COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY, SERVICES OR RIGHTS, (III) FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, (IV) FOR INTERRUPTION OF USE OR LOSS OR CORRUPTION OF DATA; OR (V) FOR ANY MATTER BEYOND ITS REASONABLE CONTROL.

13.    Miscellaneous. Company reserves the right to change or discontinue any products or services at any time, subject to thirty (30) days notice for discontinuation of major changes. Neither this Agreement nor the licenses granted hereunder are assignable or transferable by Licensee without the prior written consent of Company (except to a successor to all or substantially all of Licensee's business or assets), any attempt to do so shall be void. Company may assign this Agreement in whole or in part. Any notice, report, approval or consent required or permitted hereunder shall be in writing. No failure or delay in exercising any right hereunder will operate as a waiver thereof, nor will any partial exercise of any right or power hereunder preclude further exercise. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be deemed to have been made in, and shall be construed pursuant to the laws of the State of California and the United States without regard to conflicts of laws provisions thereof, and without regard to the United Nations Convention on the International Sale of Goods. Any waivers or amendments shall be effective only if made in writing. This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement. The prevailing party in any action to enforce this Agreement will be entitled to recover its attorney's fees and costs in connection with such action. As defined in FAR section 2.101, DFAR section 252.227-7014(a)(1) and DFAR section 252.227-7014(a)(5) or otherwise, all Product Components, FixLet Messages and accompanying documentation provided by Company are "commercial items," "commercial computer software" and/or "commercial

 

ceived Fax :    Aug 23 2004 7:14PM    Fax Station :    JUNGLE DIGITAL    P 26

BigFix Channel Agreement Number: _____

computer software documentation." Consistent with DFAR section 227.7202 and FAR section 12.212, any use, modification, reproduction, release, performance, display, disclosure or distribution

thereof by or for the U.S. Government shall be governed solely by the terms of this Agreement and shall be prohibited except to the extent expressly permitted by the terms of this Agreement.

Received Fax on  Aug 23 2004  12:14PM  Fax Station  SURGE DIGITAL  p 2/2



## BIGFIX
### Price List
### Effective August 1, 2004

**BigFix Enterprise Suite Platform**

| | 1 Year Term (payment in advance) | 2 Year Term (payment in advance) | 3 Year Term (payment in advance) |
|---|---|---|---|
| BES Server, BES Console, BES Relay, BES Web Reports | BES-PLAT-1YS * Agent REQUIRED | BES-PLAT-2YS * Agent REQUIRED | BES-PLAT-3YS * Agent REQUIRED |

**BigFix Agent for Windows, Unix, and Linux**

Quantity pricing is based on the TOTAL number of agents in the deployment. Minimum of 100 agents in initial deployment. Incremental purchases of agents must be ordered in blocks of 50 but the total number may contain any mix of supported platforms.

| | 1 Year Term (payment in advance) | | 2 Year Term (payment in advance) | | 3 Year Term (payment in advance) | |
|---|---|---|---|---|---|---|
| BES Client, All Platforms (Windows, Linux, Unix) | | | | | | |
| 100-1000 total agents | BES-CL-1YS-000 | 13.50 | BES-CL-2YS-000 | 25.08 | BES-CL-3YS-000 | 14.45 |
| 1001-2500 total agents | BES-CL-1YS-001 | 12.25 | BES-CL-2YS-001 | 22.70 | BES-CL-3YS-001 | 31.25 |
| 2501-5000 total agents | BES-CL-1YS-002 | 11.35 | BES-CL-2YS-002 | 20.35 | BES-CL-3YS-002 | 28.85 |
| 5001-8000 total agents | BES-CL-1YS-003 | 10.40 | BES-CL-2YS-003 | 19.20 | BES-CL-3YS-003 | 26.45 |
| 8001-12000 total agents | BES-CL-1YS-004 | 8.80 | BES-CL-2YS-004 | 16.30 | BES-CL-3YS-004 | 22.45 |
| 12001-20000 total agents | BES-CL-1YS-005 | 7.55 | BES-CL-2YS-005 | 13.95 | BES-CL-3YS-005 | 19.25 |
| 20001+ total agents | BES-CL-1YS-006 | Quote | BES-CL-2YS-006 | Quote | BES-CL-3YS-006 | Quote |

**BigFix Solutions**

All BigFix Solutions REQUIRE the BigFix Agent and BigFix Platform. Quantity pricing is based on the TOTAL number of agents in the deployment.

| | 1 Year Term (payment in advance) | | 2 Year Term (payment in advance) | | 3 Year Term (payment in advance) | |
|---|---|---|---|---|---|---|
| Patch Manager, Windows, English OS | | | | | | |

BigFix Patch Manager for Windows, English OS (BES-PMWE), is included in the platform (BES-PLAT), at no additional cost.

| | | | | | | |
|---|---|---|---|---|---|---|
| 100-1000 total agents | BES-PMWE-1YS-000 | NC | BES-PMWE-2YS-000 | NC | BES-PMWE-3YS-000 | NC |
| 1001-2500 total agents | BES-PMWE-1YS-001 | NC | BES-PMWE-2YS-001 | NC | BES-PMWE-3YS-001 | NC |
| 2501-5000 total agents | BES-PMWE-1YS-002 | NC | BES-PMWE-2YS-002 | NC | BES-PMWE-3YS-002 | NC |
| 5001-8000 total agents | BES-PMWE-1YS-003 | NC | BES-PMWE-2YS-003 | NC | BES-PMWE-3YS-003 | NC |
| 8001-12000 total agents | BES-PMWE-1YS-004 | NC | BES-PMWE-2YS-004 | NC | BES-PMWE-3YS-004 | NC |
| 12001-20000 total agents | BES-PMWE-1YS-005 | NC | BES-PMWE-2YS-005 | NC | BES-PMWE-3YS-005 | NC |
| 20001+ total agents | BES-PMWE-1YS-006 | NC | BES-PMWE-2YS-006 | NC | BES-PMWE-3YS-006 | NC |

| | | | | | | |
|---|---|---|---|---|---|---|
| Patch Manager, non-Windows (Unix, Linux), English OS | | | | | | |
| 100-1000 total agents | BES-PMNWE-1YS-000 | 10.00 | BES-PMNWE-2YS-000 | 18.50 | BES-PMNWE-3YS-000 | 25.50 |
| 1001-2500 total agents | BES-PMNWE-1YS-001 | 9.10 | BES-PMNWE-2YS-001 | 16.80 | BES-PMNWE-3YS-001 | 23.15 |
| 2501-5000 total agents | BES-PMNWE-1YS-002 | 8.40 | BES-PMNWE-2YS-002 | 15.20 | BES-PMNWE-3YS-002 | 21.35 |
| 5001-8000 total agents | BES-PMNWE-1YS-003 | 7.70 | BES-PMNWE-2YS-003 | 14.20 | BES-PMNWE-3YS-003 | 19.60 |
| 8001-12000 total agents | BES-PMNWE-1YS-004 | 6.55 | BES-PMNWE-2YS-004 | 12.05 | BES-PMNWE-3YS-004 | 16.65 |
| 12001-20000 total agents | BES-PMNWE-1YS-005 | 5.60 | BES-PMNWE-2YS-005 | 10.35 | BES-PMNWE-3YS-005 | 14.25 |
| 20001+ total agents | BES-PMNWE-1YS-006 | Quote | BES-PMNWE-2YS-006 | Quote | BES-PMNWE-3YS-006 | Quote |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mobile Security Manager, Windows, English OS | | | | | | |
| 100-1000 total agents | BES-MSM-1YS-000 | 5.00 | BES-MSM-2YS-000 | 9.25 | BES-MSM-3YS-000 | 12.75 |
| 1001-2500 total agents | BES-MSM-1YS-001 | 4.55 | BES-MSM-2YS-001 | 8.40 | BES-MSM-3YS-001 | 11.60 |
| 2501-5000 total agents | BES-MSM-1YS-002 | 4.20 | BES-MSM-2YS-002 | 7.75 | BES-MSM-3YS-002 | 10.70 |
| 5001-8000 total agents | BES-MSM-1YS-003 | 3.85 | BES-MSM-2YS-003 | 7.10 | BES-MSM-3YS-003 | 9.80 |
| 8001-12000 total agents | BES-MSM-1YS-004 | 3.30 | BES-MSM-2YS-004 | 6.05 | BES-MSM-3YS-004 | 8.35 |
| 12001-20000 total agents | BES-MSM-1YS-005 | 2.80 | BES-MSM-2YS-005 | 5.20 | BES-MSM-3YS-005 | 7.15 |
| 20001+ total agents | BES-MSM-1YS-006 | Quote | BES-MSM-2YS-006 | Quote | BES-MSM-3YS-006 | Quote |

BigFix Confidential

P. 27

**Client Manager for AntiVirus, Windows, English OS**

| | | | | | | |
|---|---|---|---|---|---|---|
| 100-1000 total agents | BES-CLMHAVE-1YS-B00 | 2.00 | BES-CLMHAVE-2YS-B00 | 3.70 | BES-CLMHAVE-3YS-B00 | 4.85 |
| 1001-2500 total agents | BES-CLMHAVE-1YS-B01 | 1.85 | BES-CLMHAVE-2YS-B01 | | BES-CLMHAVE-3YS-B01 | 4.55 |
| 2501-5000 total agents | BES-CLMHAVE-1YS-B02 | | BES-CLMHAVE-2YS-B02 | | BES-CLMHAVE-3YS-B02 | 4.50 |
| 5001-8000 total agents | BES-CLMHAVE-1YS-B03 | 1.55 | BES-CLMHAVE-2YS-B03 | 2.85 | BES-CLMHAVE-3YS-B03 | 3.75 |
| 8001-12000 total agents | BES-CLMHAVE-1YS-B04 | 1.35 | BES-CLMHAVE-2YS-B04 | | BES-CLMHAVE-3YS-B04 | |
| 12001-20000 total agents | BES-CLMHAVE-1YS-B05 | 1.15 | BES-CLMHAVE-2YS-B05 | | BES-CLMHAVE-3YS-B05 | |
| 20001+ total agents | BES-CLMHAVE-1YS-B06 | Quote | BES-CLMHAVE-2YS-B06 | Quote | BES-CLMHAVE-3YS-B06 | Quote |

**Client Manager for Microsoft SMS, Windows, English OS**

| | | | | | | |
|---|---|---|---|---|---|---|
| 100-1000 total agents | BES-CLMSMSE-1YS-B00 | 2.35 | BES-CLMSMSE-2YS-B00 | 1.70 | BES-CLMSMSE-3YS-B00 | 3.12 |
| 1001-2500 total agents | BES-CLMSMSE-1YS-B01 | 1.85 | BES-CLMSMSE-2YS-B01 | 3.46 | BES-CLMSMSE-3YS-B01 | 4.55 |
| 2501-5000 total agents | BES-CLMSMSE-1YS-B02 | 1.70 | BES-CLMSMSE-2YS-B02 | 2.10 | BES-CLMSMSE-3YS-B02 | 4.30 |
| 5001-8000 total agents | BES-CLMSMSE-1YS-B03 | 1.55 | BES-CLMSMSE-2YS-B03 | 2.85 | BES-CLMSMSE-3YS-B03 | 3.90 |
| 8001-12000 total agents | BES-CLMSMSE-1YS-B04 | 1.35 | BES-CLMSMSE-2YS-B04 | | BES-CLMSMSE-3YS-B04 | 3.30 |
| 12001-20000 total agents | BES-CLMSMSE-1YS-B05 | 1.15 | BES-CLMSMSE-2YS-B05 | 2.16 | BES-CLMSMSE-3YS-B05 | 1.80 |
| 20001+ total agents | BES-CLMSMSE-1YS-B06 | Quote | BES-CLMSMSE-2YS-B06 | Quote | BES-CLMSMSE-3YS-B06 | Quote |

## BigFix Development Tools for End-Users

**Configuration Manager**   Configuration Manager is available in quantities greater than 2500 total agents.

| | | | | | | |
|---|---|---|---|---|---|---|
| 100-1000 total agents | BES-CM-1YS-B00 | NA | BES-CM-2YS-B00 | NA | BES-CM-3YS-B00 | NA |
| 1001-2500 total agents | BES-CM-1YS-B01 | NA | BES-CM-2YS-B01 | NA | BES-CM-3YS-B01 | NA |
| 2501-5000 total agents | BES-CM-1YS-B02 | 5.00 | BES-CM-2YS-B02 | 9.35 | BES-CM-3YS-B02 | 12.75 |
| 5001-8000 total agents | BES-CM-1YS-B03 | 4.65 | BES-CM-2YS-B03 | 8.90 | BES-CM-3YS-B03 | 11.70 |
| 8001-12000 total agents | BES-CM-1YS-B04 | 3.90 | BES-CM-2YS-B04 | 7.20 | BES-CM-3YS-B04 | 9.95 |
| 12001-20000 total agents | BES-CM-1YS-B05 | 3.35 | BES-CM-2YS-B05 | 6.25 | BES-CM-3YS-B05 | 8.50 |
| 20001+ total agents | BES-CM-1YS-B06 | Quote | BES-CM-2YS-B06 | Quote | BES-CM-3YS-B06 | Quote |

## BigFix Development Tools for Partners

**All BigFix Solutions REQUIRE the BigFix Agent and BigFix Platform.**

**BigFix Development Environment**

| | | | | | | |
|---|---|---|---|---|---|---|
| 800 (2 concurrently licensed developer seats) | BES-BDE-1YS | 5000.00 | BES-BDE-2YS | 9250.00 | BES-BDER-3YS | 12750.00 |

**Custom Authoring Runtime License**

| | | | | | | |
|---|---|---|---|---|---|---|
| 100-1000 total agents | BES-BDER-1YS-B00 | 3.00 | BES-BDER-2YS-B00 | 5.55 | BES-BDER-3YS-B00 | 7.65 |
| 1001-2500 total agents | BES-BDER-1YS-B01 | 2.75 | BES-BDER-2YS-B01 | 5.05 | BES-BDER-3YS-B01 | 6.95 |
| 2501-5000 total agents | BES-BDER-1YS-B02 | 2.55 | BES-BDER-2YS-B02 | 4.65 | BES-BDER-3YS-B02 | 6.45 |
| 5001-8000 total agents | BES-BDER-1YS-B03 | 2.35 | BES-BDER-2YS-B03 | 4.30 | BES-BDER-3YS-B03 | 5.96 |
| 8001-13000 total agents | BES-BDER-1YS-B04 | 2.00 | BES-BDER-2YS-B04 | 3.65 | BES-BDER-3YS-B04 | 5.00 |
| 12001-20000 total agents | BES-BDER-1YS-B05 | 1.70 | BES-BDER-2YS-B05 | 3.10 | BES-BDER-3YS-B05 | 4.30 |
| 20001+ total agents | BES-BDER-1YS-B06 | Quote | BES-BDER-2YS-B06 | Quote | BES-BDER-3YS-B06 | Quote |

## BigFix Support

| | | Price | |
|---|---|---|---|
| BigFix Support | BES-SUP-BASIC | — | Included in BigFix Agent pricing. 24x7x365 web support, including Support Knowledge Base, FAQs, product documentation and bug reporting, email support with target response time; telephone support during expanded business hours (7am-7pm PST). Reporting and resolution of up to 6 incidents/month, maintenance software releases. |

## BigFix Professional Services & Training

| | | Price | Duration |
|---|---|---|---|
| **BES Implementation** | Planning, deployment and optimization of BES installation, training of BES site administrator. | | |
| 0-5000 agents | BES-EDU-IAT-S01 | 3,200.00 | 2 days |
| 5001-10000 agents | BES-EDU-IAT-S02 | 4,800.00 | 3 days |
| 10001-15000 agents | BES-EDU-IAT-S03 | 6,400.00 | 4 days |
| 15001-20000 agents | BES-EDU-IAT-S04 | 8,000.00 | 5 days |
| 20001-25000 agents | BES-EDU-IAT-S05 | 9,600.00 | 6 days |
| 25001-30000 agents | BES-EDU-IAT-S06 | 11,200.00 | 7 days |
| 30001-35000 agents | BES-EDU-IAT-S07 | 12,800.00 | 8 days |
| 35001-40000 agents | BES-EDU-IAT-S04 | 14,400.00 | 9 days |
| 40001-45000 agents | BES-EDU-IAT-S07 | 16,039.00 | 10 days |
| 45001-50000 agents | BES-EDU-IAT-S07 | 17,600.00 | 11 days |
| 50001+ agents | BES-EDU-IAT-S08 | Quote | |
| **BES User Training** | BES Console Operator training, and BES Web Reports training for Licensee employees and contractors; 1 day of onsite training for up to 12 trainees. | | |
| | BES-EDU-BASIC | 2,300.00 | 1 day |

P 28

℀ JS 44   (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I.  (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| BIGFIX ASIA PTE., LTD. | BIGFIX INC. **E-FILING**   **ADF** |

| **(b)** County of Residence of First Listed Plaintiff  Singapore<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant     Alameda<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
|---|---|
| **(c)** Attorney's (Firm Name, Address, and Telephone Number)<br>Ardell Johnson, Cal. State Bar No. 95340<br>KORDA, JOHNSON & WALL, LLP<br>66 E. Santa Clara St., Suite 250<br>San Jose, CA 95113 | Attorneys (If Known)<br><br>**C08  04023**  HRL |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [X] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                       and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [X] 3 | [ ] 3 | Foreign Nation | [X] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[X] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury | **PERSONAL INJURY**<br>[ ] 362 Personal Injury— Med. Malpractice<br>[ ] 365 Personal Injury — Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 610 Agriculture<br>[ ] 620 Other Food & Drug<br>[ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 630 Liquor Laws<br>[ ] 640 R.R. & Truck<br>[ ] 650 Airline Regs.<br>[ ] 660 Occupational Safety/Health<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 840 Trademark | [ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit<br>[ ] 490 Cable/Sat TV<br>[ ] 810 Selective Service<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 875 Customer Challenge 12 USC 3410<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 892 Economic Stabilization Act<br>[ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 444 Welfare<br>[ ] 445 Amer. w/Disabilities – Employment<br>[ ] 446 Amer. w/Disabilities – Other<br>[ ] 440 Other Civil Rights | [ ] 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Mgmt. Relations<br>[ ] 730 Labor/Mgmt.Reporting & Disclosure Act<br>[ ] 740 Railway Labor Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Empl. Ret. Inc. Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act<br>[ ] 895 Freedom of Information Act<br>[ ] 900Appeal of Fee Determination Under Equal Access to Justice<br>[ ] 950 Constitutionality of State Statutes |
| | | | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 463 Habeas Corpus – Alien Detainee<br>[ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

| **VI.  CAUSE OF ACTION** | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):<br>28 U.S.C. sec. 1332<br>Brief description of cause:<br>Violation of California Franchise Investment Law, Fraud, Breach of Contract, Interference with Contract, Quantum Meruit |
|---|---|

| **VII.  REQUESTED IN COMPLAINT:** | [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | DEMAND $ Exceeds $2.5 M | CHECK YES only if demanded in complaint:<br>JURY DEMAND: [X] Yes [ ] No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)     [X] SAN FRANCISCO/OAKLAND     [ ] SAN JOSE

| DATE<br>August 22, 2008 | SIGNATURE OF ATTORNEY OF RECORD<br>*Ardell Johnson* |
|---|---|